# IN THE SUPREME COURT OF IOWA

No. 11–1208

Filed May 24, 2013

**STATE OF IOWA,**

    Appellee,

vs.

**CHRISTINE ANN KERN,**

    Appellant.

_____

Appeal from the Iowa District Court for Polk County, Artis I. Reis, Douglas F. Staskal, and Robert B. Hanson, Judges.

The defendant appeals her conviction on narcotics charges by challenging the search of her home and the sufficiency of the evidence. **REVERSED AND REMANDED.**

Christopher R. Kemp of Kemp Sease & Dyer, Des Moines, for appellant.

Thomas J. Miller, Attorney General, Richard J. Bennett Sr. and Kevin R. Cmelik, Assistant Attorneys General, John P. Sarcone, County Attorney, and Joseph D. Crisp and Andrea M. Petrovich, Assistant County Attorneys, for appellee.

**CADY, Chief Justice.**

In this appeal, we primarily consider the constitutionality of a search of the home of a parolee that uncovered evidence used to prosecute and convict the parolee of numerous drug offenses. In doing so, we must determine if the search was justified by the doctrines of consent, special needs, exigent circumstances, community caretaking, or a general balancing of the governmental interests served by the search against the privacy interest of the parolee. We also consider the sufficiency of the evidence to support the charges. On our review, we find the search of the home and the seizure of the evidence violated article I, section 8 of the Iowa Constitution. We reverse the judgment and sentence of the district court and remand the case for further proceedings.

## I. Background Facts and Proceedings.

Christine Kern was a parolee living in Des Moines. She was granted parole on February 17, 2010, following a period of incarceration for a conviction of operating a motor vehicle while intoxicated, third offense. As a condition of parole, Kern signed a parole agreement. The agreement contained numerous standard conditions of parole, including paragraph P, which provided: "I will submit my person, property, place of residence, vehicle, personal effects to search at any time, with or without a search warrant, warrant of arrest or reasonable cause by any parole officer or law enforcement officer." Paragraph P is a standard condition of parole in Iowa.

On November 3, 2010, Staci Huisman, a child assessment worker with the Iowa Department of Human Services (DHS), received an anonymous complaint that marijuana was being grown and processed in the house where Kern resided. The complaint also claimed marijuana

was used and sold in the house, and these circumstances endangered Kern's sixteen-year-old daughter and her infant grandchild who occasionally stayed in the house. At the time, Kern lived in the home with her boyfriend, Sean Grant.

On November 5, 2010, Huisman investigated the complaint by making a home visit with the assistance of two police officers. The police routinely assist the DHS in their investigation of drug complaints in order to protect the safety of the investigator. The police presence also offers an opportunity for them to request consent to search the premise for illegal substances.

Huisman met narcotics police officers, Mark Chance and Matthew Jenkins, near Kern's residence, and they proceeded to the residence. Kern responded to a knock on the door, and she allowed Huisman and the officers to enter the home. Grant was also present. The officers felt Grant purposely stood between them and the interior of the home to prevent them from entering further into the home. Huisman explained the nature of the complaint and asked for consent to search the residence. Kern and Grant denied the allegations and denied consent to search the residence. Detective Jenkins believed the conduct of Kern and Grant was "defensive."

Huisman explained she would need to remove the children from the residence if she was unable to search the home. Kern still refused to give consent. Huisman spoke with Kern's daughter and explained the situation and the allegations against Kern and Grant.[1]

---

[1]About a week later, in a follow-up meeting, Kern's daughter acknowledged that Grant used marijuana and sold it to other people. However, she denied knowledge of the grow operation.

Huisman then removed the children and left the residence with the officers. After traveling a short distance, Huisman advised the officers that Kern was a parolee. Jenkins called Sergeant Brandon Garvey of the probation and parole office and asked him to assist in searching the house pursuant to the standard consent provision of parole agreements.

Garvey told Jenkins he was unable to immediately assist the law enforcement officers, but verified Kern was on parole and that she had signed a parole agreement containing the consent-search clause in paragraph P. Garvey also gave Jenkins permission to conduct the search on his behalf.

Chance and Jenkins returned to Kern's residence. Kern appeared to be walking to her car as the officers arrived, but she returned to the house when she saw the officers. The officers informed Kern and Grant they intended to search the house because Kern was a parolee and had consented to a search in her parole agreement.

Jenkins remained with Kern and Grant while Chance began the search. Garvey, the parole officer, arrived shortly after the search started. In the basement, Chance found three separate marijuana growing operations consisting of numerous marijuana plants. He then accompanied Grant to a bedroom he shared with Kern. The bedroom contained guns, as well as marijuana. The marijuana was located in a jar on a dresser and a jar on a bed stand. Marijuana was also found in large quantities in the dining room. The dining room appeared to serve as a place to dry marijuana. Plants were strewn about the room, and two large glass jars of dried marijuana were in the room. More glass jars of marijuana were located in a dresser in the living room. Kern and Grant were arrested. Grant immediately took full responsibility for the marijuana operation and said Kern had nothing to do with it.

The State charged Kern with four crimes: (1) conspiracy to manufacture a controlled substance in violation of Iowa Code section 124.401(1)(d) (2009), (2) manufacturing a controlled substance in violation of Iowa Code section 124.401(1)(d), (3) possession of a controlled substance with intent to deliver in violation of Iowa Code section 124.401(1)(d), and (4) failure to possess a tax stamp in violation of Iowa Code sections 453B.3 and 453B.12.

Prior to trial, Kern joined Grant's motion to suppress the marijuana as evidence at trial. She argued it was obtained in violation of her constitutional rights under the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution.

In a hearing on the motion, Chance and Jenkins testified that Kern's refusal to grant permission to search her house suggested to them that drugs were located in the house. The State argued Kern waived her rights to object to the search by signing a parole agreement containing paragraph P. The State also asserted the search was justified by several recognized exceptions to the warrant clauses of the Fourth Amendment and article I, section 8. The exceptions included exigent circumstances, the community caretaking function of police officers, and the special needs presented by the maintenance of a parole system. Finally, the State argued the search was reasonable under the totality of the circumstances.

The district court found Kern gave "advance consent to search her property without a warrant or without reasonable cause" by signing the parole agreement. Additionally, it upheld the search as reasonable based on the DHS complaint combined with the police officer's suspicion derived from the conduct of Kern and Grant during the initial encounter.

The court also found the search was justified under exigent circumstances and the community caretaking function.

In a subsequent trial on the minutes of testimony, the district court found Kern guilty of all four counts. It imposed judgment and sentence, and Kern appealed.

## II. Issues Presented.

Kern raised two issues on appeal. First, she asserted there was insufficient evidence to support a finding of guilt beyond a reasonable doubt on each of the crimes charged. Second, Kern asserted the search of her home was in violation of her constitutional search and seizure rights under the Fourth Amendment of the United States Constitution and article I, section 8 of the Iowa Constitution. To resolve this second claim, we must unravel several threads of constitutional search and seizure law, including waiver or consent, special needs, exigent circumstances, community caretaking, and what has been termed the "general balancing approach."

## III. Sufficiency of the Evidence.

**A. Scope and Standard of Review.** We first address whether the State introduced sufficient evidence for a fact finder to find Kern guilty beyond a reasonable doubt. We address this issue first because the Double Jeopardy Clause would not permit a retrial of the charges if there was insufficient evidence of guilt presented at trial. *State v. Dullard*, 668 N.W.2d 585, 597 (Iowa 2003) (citing *Lockhart v. Nelson*, 488 U.S. 33, 39, 109 S. Ct. 285, 290, 102 L. Ed. 2d 265, 272–73 (1988)).

We review challenges to the sufficiency of the evidence presented at trial for correction of errors of law. *State v. Randle*, 555 N.W.2d 666, 671 (Iowa 1996). The essential question before the court on a challenge to sufficiency of the evidence is whether there was substantial evidence to

support a guilty verdict beyond a reasonable doubt. *State v. Torres*, 495 N.W.2d 678, 681 (Iowa 1993).

We view the evidence presented at trial in the light most favorable to the State but consider all the evidence in the record, not just the evidence favoring the State. *Id.* Moreover, "[t]he evidence must raise a fair inference of guilt and do more than create speculation, suspicion, or conjecture." *State v. Webb*, 648 N.W.2d 72, 76 (Iowa 2002).

**B. Discussion.** Iowa Code section 124.401(1) makes it

> unlawful for any person to manufacture, deliver, or possess with the intent to manufacture or deliver, a controlled substance, a counterfeit substance, or a simulated controlled substance, or to act with, enter into a common scheme or design with, or conspire with one or more other persons to manufacture, deliver, or possess with the intent to manufacture or deliver a controlled substance, a counterfeit substance, or a simulated controlled substance.

While section 124.401(1) prohibits a variety of conduct, it essentially defines one prohibition that can be violated in a number of ways. *See State v. Parrish*, 502 N.W.2d 1, 3 (Iowa 1993) (discussing Iowa Code section 204.401(1), the predecessor of Iowa's current controlled substance statute). We address each violation under the statute.

1. *Conspiracy to manufacture a controlled substance in violation of Iowa Code section 124.401(1)(*d*).* Kern asserts the district court erroneously found her guilty of conspiracy to manufacture a controlled substance in violation of Iowa Code section 124.401(1)(*d*). *See State v. Speicher*, 625 N.W.2d 738, 741 (Iowa 2001) (discussing the relationship between Iowa's controlled substance statute, Iowa Code section 124.401, and Iowa's conspiracy statute, Iowa Code section 706.1).

To convict Kern of conspiracy to manufacture a controlled substance, the State was required to show:

> (1) the defendant agreed with one or more persons that one or both of them would manufacture or attempt to manufacture [marijuana], (2) the defendant entered into such an agreement with the intent to promote or facilitate the manufacture of [marijuana], (3) one of the parties to the agreement committed an overt act to accomplish the manufacturing of [marijuana], and (4) the alleged coconspirator(s) was not a law enforcement agent or assisting law enforcement when the conspiracy began.

*See State v. Fintel*, 689 N.W.2d 95, 102 (Iowa 2004) (alterations added); *see also* Iowa Code § 706.1 (defining the crime of conspiracy).

Here, the evidence supported a finding that Grant engaged in an overt act of growing marijuana in the home.  Moreover, Grant was not a law enforcement agent or assisting law enforcement.  Thus, the fighting issue is whether Kern formed an agreement that Grant would manufacture marijuana and whether she formed such an agreement with the intent to promote or facilitate the manufacture of marijuana.  The State was not required to show Kern manufactured marijuana, but that she agreed Grant would manufacture marijuana.  *See State v. Casady*, 597 N.W.2d 801, 807 (Iowa 1999); *see also State v. Corsi*, 686 N.W.2d 215, 220 (Iowa 2004); *State v. Carlson*, 203 Iowa 90, 93, 212 N.W. 312, 313 (1927).

A conspiracy is essentially a criminal contract characterized "as a 'concert of free wills,' 'union of the minds of at least two persons,' and 'a mental confederation involving at least two persons.' "  *Speicher*, 625 N.W.2d at 741–42 (quoting *State v. Boyer*, 342 N.W.2d 497, 499 (Iowa 1984)).  Conspiracies are, by nature, clandestine affairs.  *Corsi*, 686 N.W.2d at 219.  Thus, direct evidence of an agreement to form a conspiracy is often absent, and in response, we have consistently allowed circumstantial evidence and inferences drawn from the circumstances to support a conviction on a conspiracy charge.  *Id.*; *accord State v. Blyth*,

226 N.W.2d 250, 263 (Iowa 1975); *Carlson*, 203 Iowa at 93, 212 N.W. at 313. We have also said:

> "An agreement that, because of its purpose or the means contemplated, amounts to a conspiracy need not be formal or express, but may be a tacit understanding; the agreement may be inherent in and inferred from the circumstances, especially declarations, acts, and conduct of the alleged conspirators."

*State v. Mapp*, 585 N.W.2d 746, 748 (Iowa 1998) (quoting 16 Am. Jur. 2d *Conspiracy* § 10, at 204–05 (1998)).

Circumstantial evidence of an agreement must be based on more than suspicion. *State v. Keyser*, 257 Iowa 73, 79, 130 N.W.2d 701, 704 (1964). Similarly, "circumstantial evidence that proves mere presence at the scene of the crime or association with those involved in the crime is not sufficient to show an agreement." *Corsi*, 686 N.W.2d at 219. Mere presence or general association creates no more than "conjecture and speculation" of criminal complicity. *Speicher*, 625 N.W.2d at 743.

However, the central location of the manufacturing process can be relevant to the element of an agreement. *See Corsi*, 686 N.W.2d at 220 (observing that defendant's commission of drug manufacturing in a codefendant's apartment supports an inference that the defendant had the apartment tenant's permission to conduct the illegal activity, which supports an inference that a conspiracy between them had been formed). In *Corsi*, we implicitly acknowledged the existence of an important inversion of our holding in *Speicher* that mere presence at the location of a crime or mere association with criminals was insufficient for a finding that the defendant formed an agreement. While the mere presence of a person on *someone else's property* where *someone else* is or has been manufacturing a controlled substance supports only conjecture of

participation in the conspiracy, permission given by a property owner for others to maintain an obvious manufacturing operation *throughout the premises* would be strongly suggestive of a tacit agreement, at the very least. *See id.* at 220.

Indeed, our decision in *Fintel*, which arose out of the same facts as *Corsi*, is instructive here. In *Corsi*, the defendant was prosecuted for manufacturing a controlled substance in Fintel's apartment. *See id.* at 219–20. Thus, we contemplated in *Fintel* that a conspiracy could be inferred in part because the defendant "*knew* methamphetamine was being manufactured in his apartment" and the "defendant's apartment was littered with the necessary ingredients and utensils for manufacturing methamphetamine." *Fintel*, 689 N.W.2d at 102 (emphasis added). While more inculpatory evidence was presented in *Fintel* than in this case—and we did not pass on whether Fintel's possession of the apartment in which he knowingly allowed manufacturing of narcotic substances was alone sufficient to find his participation in the conspiracy—it was evident an agreement to manufacture controlled substances inhered in the circumstances. *See id.* One person knowingly permitted another to produce copious quantities of those substances on premises the person occupied and controlled. *Id.* A fact finder was permitted to draw these inferences.

Here, a rational fact finder could have inferred a tacit agreement between Kern and Grant. Even assuming Kern took no part in the actual manufacture of marijuana, there was evidence to show Grant maintained an extensive growing, drying, and selling operation throughout the home. Marijuana plants were found in the basement. A marijuana drying room existed on the main floor. Marijuana was found in jars in the bedroom Kern and Grant shared. Kern's daughter told the DHS officer a week

after the search that she was well aware of Grant's narcotic use and sales. She similarly informed the DHS officer that Kern was also aware the marijuana was sold.

Accordingly, we conclude the extensive presence of a marijuana growing operation throughout the home and the obvious knowledge of the operation constituted substantial evidence upon which a rational fact finder could infer an agreement between the two occupants of the home wherein one occupant would promote or facilitate the other in the manufacture of a controlled substance by allowing the operation to take place in the residence. The operation was so extensive that Kern literally lived with the manufacturing process. Additionally, Grant needed cover to operate the illegal enterprise, and Kern provided that cover by permitting the residence to be used to manufacture marijuana. Our law only requires the existence of a tacit understanding to support a conspiracy, and this evidence was sufficient to infer such an understanding. We stress that mere knowledge by an owner or renter of a premise that a controlled substance is manufactured on their premises does not make an agreement. Rather, we simply hold that a fact finder relying on the evidence in this case could rationally find beyond a reasonable doubt that Kern intended to promote or facilitate the manufacturing of marijuana.

2. *Possession of a controlled substance with intent to deliver in violation of Iowa Code section 124.401(1)(d).* Kern was found guilty of possession of a controlled substance with intent to deliver. She argues insufficient evidence was presented to support a finding by the district court that she possessed the marijuana. We agree.

Under the statute, the State must prove the accused " 'exercised dominion and control over the contraband, had knowledge of the

contraband's presence, and had knowledge the material was a narcotic.' " *State v. Dewitt*, 811 N.W.2d 460, 474 (Iowa 2012) (quoting *State v. Maxwell*, 743 N.W.2d 185, 193 (Iowa 2008)). "The location in which the substance is found guides our determination of possession." *Id.* Because no marijuana was found on Kern's person, she was not in actual possession of the marijuana. *See id.* Accordingly, we must consider whether there was sufficient evidence of constructive possession. *See id.*

To prove constructive possession, the State must show "the defendant had knowledge of the controlled substance as well as the authority or right to control it." *Id.* Our seminal constructive possession case is *State v. Reeves*, 209 N.W.2d 18 (Iowa 1973). In *Reeves*, we said:

> If the premises on which such substances are found are in the exclusive possession of the accused, knowledge of their presence on such premises coupled with his ability to maintain control over such substances may be inferred. Although no further proof of knowledge by the State is required in cases of exclusive possession by the accused the inference of knowledge is rebuttable and not conclusive. But where the accused has not been in exclusive possession of the premises but only in joint possession, knowledge of the presence of the substances on the premises and the ability to maintain control over them by the accused will not be inferred but must be established by proof.

*Id.* at 23.

Thus, constructive possession involves inferences. Yet, our law does not permit an inference to be drawn based only on the presence of drugs found in a jointly occupied premise, as opposed to the exclusive occupancy of a premises. *See id.* More proof is needed to draw the constructive possession inference. In addition to proof of immediate and exclusive possession of the place where drugs are found on a premises, we identified the nature of this additional proof as

(1) incriminating statements made by a person; (2) incriminating actions of the person upon the police's discovery of a controlled substance among or near the person's personal belongings; (3) the person's fingerprints on the packages containing the controlled substance; and (4) any other circumstances linking the person to the controlled substance.

*Maxwell,* 743 N.W.2d at 194.

In this case, only the fourth factor is implicated. We must decide if the presence of a vast marijuana growing operation in plain view throughout the home was enough additional proof to draw an inference of constructive possession of the marijuana found in a jointly occupied house.

We return to the basic meaning of dominion and control to answer this question. In the absence of actual possession, constructive possession requires the person to maintain control over the drugs or have the right to control the drugs. *See Reeves,* 209 N.W.2d at 23. This standard focuses on the "ability to maintain control." *Id.* When the facts only show joint dominion and control over a premises, however, it is unfair to impute control over the drugs without more proof, such as immediate and exclusive access to the place where the drugs were found in the jointly occupied premises.

The broad rationale behind this approach involves a balance between two competing considerations. *State v. Simpson,* 528 N.W.2d 627, 636 (1995) (Ternus, J., dissenting). Convictions for possession of drugs should be possible under the law, even though the defendant is not caught "red-handed," but innocent bystanders in the wrong place at the wrong time must be protected from a conviction. *Id.* Our guideposts governing joint occupancy strike this balance. *Id.* Here, the question is whether the vast nature of the drug operation within the house was

enough additional proof to provide an inference that Kern maintained dominion and control over the marijuana.

In this case, there was no evidence that Kern was more than an agreeable bystander to a vast operation she permitted to take place. An inference that Kern conspired with Grant for him to use the house to grow and process marijuana cannot be extended to also support an inference that Kern exercised dominion and control over the marijuana, without some evidence pointing to dominion and control. Conspiracy and possession are independent concepts. Without more evidence than the presence of the marijuana operation, an inference of dominion and control would only be based on the presence of the marijuana in the house. Our long-standing rule does not permit an inference of dominion and control based only on the presence of drugs in a jointly occupied premises. *Reeves*, 209 N.W.2d at 23. Thus, there was insufficient evidence presented at trial that Kern possessed marijuana.

3. *Manufacturing a controlled substance in violation of Iowa Code section 124.401(1)(*d*).* The district court also found Kern guilty of manufacturing a controlled substance. She argues there was insufficient evidence to support this count. We agree.

The district court relied on Kern's knowledge of the manufacturing operation in her home to infer she manufactured the marijuana. However, the Iowa Code contemplates manufacturing as an active concept, requiring more than the mere passive knowledge of the defendant. It requires proof of an affirmative act of manufacturing, which the State failed to produce.

"Manufacture" is defined in chapter 124 of the Iowa Code as

> the production, preparation, propagation, compounding, conversion, or processing of a controlled substance, either

directly or by extraction from substances of natural origin, or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis, and includes any packaging or repackaging of the substance or labeling or relabeling of its container . . . .

Iowa Code § 124.101(18). This language suggests manufacturing involves affirmative acts or an activity. This concept is reinforced by considering that the separate criminal offense of manufacturing methamphetamine in the presence of a minor specifically refers to manufacturing as an "activity." *Id.* § 124.401C(2). "Activity" in this context means "an occupation, pursuit, or recreation in which a person is active." *Webster's Third New International Dictionary* 22 (unabr. ed. 2002).

Two cases augment this view. In *Casady*, we observed that manufacturing a controlled substance and conspiring to manufacture a controlled substance represent two alternative ways to violate section 124.401(1). 597 N.W.2d at 807. We said,

> [t]he first alternative means of violating the statute is the actual manufacture of drugs, but the second alternative includes a conspiracy to manufacture it. Contrary to Casady's argument, it is not necessary for the State to prove the second alternative by also proving the first. While the State must show an overt act toward the accomplishment of the conspiracy, it did not have to prove the completed act.

*Id.* (citations omitted). In *State v. Royer*, we held that a defendant could not be convicted of manufacturing a controlled substance without actually producing the threshold amount of a controlled substance. 632 N.W.2d 905, 909 (Iowa 2001). Implicit in this conclusion was the assumption that manufacturing requires evidence the defendant was actually engaged in one of the productive activities listed in section 124.101(18). *See id.*

We acknowledge our court of appeals has held that a conviction for manufacturing a controlled substance can be based on evidence that the defendant "was able to claim immediate dominion over the process, or maintained or shared exclusive dominion over the process." *State v. Spivie*, 581 N.W.2d 205, 208 (Iowa Ct. App. 1998). However, *Spivie* was predicated on *Rudd*, and its progeny, which permitted an inference of dominion and control based on shared, exclusive dominion. *See State v. Rudd*, 454 N.W.2d 570, 571 (Iowa 1990). In *Webb*, we overruled our holding in *Rudd* to the extent that its pronouncements concerning constructive possession were contrary to our constructive-possession principles set out in *Reeves*. *Webb*, 648 N.W.2d at 79. Thus, *Spivie* is no longer good law to the extent that its holding would apply to jointly occupied premises. Instead, *Webb* instructs that joint possession of a premises where the manufacturing of a controlled substance occurs would not alone support an inference that a joint occupant participated in the manufacturing of the controlled substance. *Id.*

Accordingly, there was insufficient evidence to support Kern's conviction for manufacturing a controlled substance in violation of section 124.401(1). The State failed to produce evidence to show Kern engaged in an affirmative act of manufacturing.

4. *Failure to possess a tax stamp in violation of Iowa Code sections 453B.3 and 453B.12.* The crime of failure to affix a drug tax stamp requires a drug dealer to possess, distribute, or offer to sell a taxable substance. Iowa Code § 453B.3. The State prosecuted Kern for this crime based on its claim that she possessed the marijuana found in the house. Having found insufficient evidence of possession, we also find insufficient evidence to support a conviction for failing to affix a drug tax stamp.

5. *Disposition.* The conviction for conspiracy was supported by sufficient evidence at trial, while the remaining convictions were not supported by substantial evidence. These three convictions must be dismissed. Thus, we proceed to consider the claim asserted by Kern that the marijuana and other evidence was illegally seized and should have been suppressed at trial. Because we ultimately agree with Kern that the search of her home violated article I, section 8 of the Iowa Constitution, trial on remand must be limited to the charge of conspiracy.

## IV. Constitutionality of the Search of Kern's Home.

**A. Scope and Standard of Review.** Kern argues the search of her home violated the guarantees of the Fourth Amendment of the United States Constitution[2] and article I, section 8 of the Iowa Constitution.[3] The State argues the search can be justified because Kern prospectively consented to warrantless, suspicionless searches by parole or other law enforcement officers when she signed a parole agreement containing a provision that purportedly granted consent to conduct such searches. In the alternative, the State argues that a special need exists justifying departure from the warrant and probable cause requirements of the Fourth Amendment and article I, section 8. The State also argues that

---

[2]The Fourth Amendment of the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

[3]Article I, section 8 of the Iowa Constitution provides:

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures and searches shall not be violated; and no warrant shall issue but on probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the persons and things to be seized.

exigent circumstances and the community caretaking function of police officers justified the search. Finally, the State argues that the search should be held reasonable under the totality of the circumstances using a generalized balancing test.

"We review claims the district court failed to suppress evidence obtained in violation of the federal and state constitutions de novo." *Dewitt*, 811 N.W.2d at 467. When presented with such a claim, " 'we make an independent evaluation [based on] the totality of the circumstances as shown by the entire record.' " *State v. Kurth*, 813 N.W.2d 270, 272 (Iowa 2012) (quoting *State v. Krogmann*, 804 N.W.2d 518, 522 (Iowa 2011)). " 'Each case must be evaluated in light of its unique circumstances.' " *Id.* at 272 (quoting *Krogmann*, 804 N.W.2d at 523).

Kern brings her claim under both the Fourth Amendment of the United States Constitution and article I, section 8 of the Iowa Constitution. When presented with a claim arising out of both the Fourth Amendment and article I, section 8, we consider the state claim independent from the federal claim. *State v. Pals*, 805 N.W.2d 767, 771 (Iowa 2011). This can be done in either order or even simultaneously. *Id.* at 772. In this case, we answer the question under our state constitution.

**B. Merits.** "We employ a two-step approach to determine whether there has been a violation of . . . article I, section 8 of the Iowa Constitution." *State v. Lowe*, 812 N.W.2d 554, 567 (Iowa 2012). First, the defendant must show he or she has "a legitimate expectation of privacy in the area searched." *Id.* Second, if so, we must determine whether the defendant's rights were violated. *Id.*

As we have recounted in other cases, the Fourth Amendment and article I, section 8 create a substantial expectation of privacy in the home. *State v. Brooks*, 760 N.W.2d 197, 204 (Iowa 2009). Given that warrantless invasion of the home was the "chief evil" the Fourth Amendment and article I, section 8 each sought to address, *see State v. Reinier*, 628 N.W.2d 460, 464 (Iowa 2001) (citing *United States v. United States Dist. Ct.*, 407 U.S. 297, 313, 92 S. Ct. 2125, 2134, 32 L. Ed. 2d 752, 764 (1972)); *see also State v. Ochoa*, 792 N.W.2d 260, 267, 277, 284–85 (Iowa 2010), it stands to reason that Iowans hold a significant and legitimate expectation of privacy in their homes. This fact of Iowa constitutional law is underscored by our piquantly stated and stirring explanation of the right a century ago in *McClurg v. Brenton*:

> The right of the citizen to occupy and enjoy his home, however mean or humble, free from arbitrary invasion and search, has for centuries been protected with the most solicitous care by every court in the English-speaking world, from Magna Charta down to the present, and is embodied in every bill of rights defining the limits of governmental power in our own republic.
>
> The mere fact that a man is an officer, whether of high or low degree, gives him no more right than is possessed by the ordinary private citizen to break in upon the privacy of a home and subject its occupants to the indignity of a search for the evidences of crime, without a legal warrant procured for that purpose. No amount of incriminating evidence, whatever its source, will supply the place of such warrant. At the closed door of the home, be it palace or hovel, even bloodhounds must wait till the law, by authoritative process, bids it open.

123 Iowa 368, 371–72, 98 N.W. 881, 882 (1904).

Under the Supreme Court's Fourth Amendment jurisprudence, parolees have little or no reasonable expectation of privacy. *See Samson v. California*, 547 U.S. 843, 852, 126 S. Ct. 2193, 2199, 165 L. Ed. 2d 250, 259 (2006) ("[W]e conclude that petitioner did not have an

expectation of privacy that society would recognize as legitimate."); *cf. United States v. Knights*, 534 U.S. 112, 121, 122 S. Ct. 587, 592, 151 L. Ed. 2d 497, 506 (2001) (holding probationer had a diminished expectation of privacy). As such, parolees effectively cannot challenge a search of their home, person, vehicle, or effects. *See Samson*, 547 U.S. at 852, 126 S. Ct. at 2199, 165 L. Ed. 2d at 259. Yet, we have held that the Iowa Constitution projects a different view that vests parolees with the expectation of privacy enjoyed by persons not convicted of crimes and allows them to object to a search of their home or person. *See State v. Cullison*, 173 N.W.2d 533, 537–38 (Iowa 1970); *see also Ochoa*, 792 N.W.2d at 291. Accordingly, Kern may seek suppression of the evidence obtained during the search of her home.

Thus, we proceed to consider the constitutionality of the search of her home. *See Lowe*, 812 N.W.2d at 567–68. This is a broad question, and it implicates several doctrines of constitutional search and seizure law. We address them in turn.

1. *Consent.* The State argues Kern prospectively consented to warrantless searches by signing a parole agreement containing a consent-to-search provision. Essentially, the State argues Kern and the State entered into a contract that establishes consent under *Schneckloth v. Bustamonte*, 412 U.S. 218, 227–28, 93 S. Ct. 2041, 2047–48, 36 L. Ed. 2d 854, 863 (1973), and *Zap v. United States*, 328 U.S. 624, 628–29, 66 S. Ct. 1277, 1279, 90 L. Ed. 1477, 1482 (1946), *judgment vacated by* 330 U.S. 800, 67 S. Ct. 857, 91 L. Ed. 2d 1259 (1947).

In *State v. Baldon*, 829 N.W.2d 785, 802–03 (Iowa 2013), we rejected this argument and held that a consent-to-search provision in a parole agreement did not establish consent to search. Accordingly, we

conclude paragraph P of Kern's parole agreement did not justify the search of Kern's home.

2. *Special needs.* The State asserts the search of Kern's home was justified because Iowa's maintenance of a parole system presents "exceptional circumstances in which special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *New Jersey v. T.L.O.*, 469 U.S. 325, 351, 105 S. Ct. 733, 748, 83 L. Ed. 2d 720, 741 (1985) (Blackmun, J., concurring); *cf. Griffin v. Wisconsin*, 483 U.S. 868, 875–76, 107 S. Ct. 3164, 3169, 97 L. Ed. 2d 709, 718–19 (1987) (holding that Wisconsin's maintenance of a probation system constitutes a special need, justifying departure from the ordinary warrant and probable cause requirements of the Fourth Amendment). Kern replies that under *Cullison* and *Ochoa* the search violated article I, section 8 of the Iowa Constitution. *See Ochoa*, 792 N.W.2d at 290–91; *Cullison*, 173 N.W.2d at 536–37. We therefore turn to consider whether the maintenance of a parole system in Iowa constitutes such a special need justifying a departure from *Cullison*.

a. *Fundamental concepts of special-needs searches as developed by the United States Supreme Court under the Fourth Amendment.* Although we have never recognized the special-needs doctrine under article I, section 8 in the context of parolees, the United States Supreme Court has articulated a core consideration for analyzing special-needs searches under the Fourth Amendment.[4] *See Camara v. Mun. Ct.*, 387

---

[4]We applied the special-needs doctrine in the school-search context in *State v. Jones*, 666 N.W.2d 142, 145–50 (Iowa 2003). In that case, a student contested the search of his locker under both the Fourth Amendment and article I, section 8. *Id.* at 144. Before proceeding to analyze the facts of the case, we said, "We usually interpret ' "the scope and purpose of article I, section 8, of the Iowa Constitution to track with federal interpretations of the Fourth Amendment." ' " *Id.* at 145 (quoting *State v. Breuer*, 577 N.W.2d 41, 44 (Iowa 1998)). *Jones* featured no independent analysis of the

U.S. 523, 533, 87 S. Ct. 1727, 1733, 18 L. Ed. 2d 930, 938 (1967). The nub of *Camara*'s rationale is that the propriety of a departure from the warrant and probable cause requirements for certain types of searches depends on whether demanding compliance with those requirements is "likely to frustrate the governmental purpose behind the search." *Id.* The question ultimately boils down to whether the policy interest served by the search would be totally lost if the warrant and probable cause requirements could not be modified. *See id.* Indeed, a court considering whether to recognize a special need in a particular circumstance must determine something exceptional exists in the situation, which at least renders the warrant infeasible. *See T.L.O.*, 469 U.S. at 356, 105 S. Ct. at 750, 83 L. Ed. 2d at 744 (Brennan, J., concurring in part and dissenting in part). Therefore, for example, the *Camara* Court's balancing revealed that particularized suspicion was unnecessary in the municipal fire code context because "the *only effective way* to seek universal compliance with the minimum standards required by municipal codes is through routine periodic inspections of all structures." *Camara,* 387 U.S. at 535–36, 87 S. Ct. at 1734, 18 L. Ed. 2d at 939 (emphasis added). In contrast, warrants showing authority to enter a home remained indispensable because the government interest could still be served within the confines

---

Iowa Constitution and did not examine why any particular search would implicate " 'special needs, beyond the normal need for law enforcement, mak[ing] the warrant and probable-cause requirement impracticable.' " *See id.* at 145–47 & n.2 (quoting *Bd. of Educ. of Indep. Sch. Dist. No. 92 v. Earls*, 536 U.S. 822, 829, 122 S. Ct. 2559, 2564, 153 L. Ed. 2d 735, 744 (2002)). In fact, our discussion of the special-needs doctrine was limited to an examination of what the United States Supreme Court had said on the subject. *See id.* at 145 & n.2. In any event, we certainly have not recognized the special-needs doctrine in the parole-search context. *See Ochoa*, 792 N.W.2d at 291 ("We have no occasion to consider . . . the potential application of special needs to searches of parolees conducted by *parole officers* . . . .").

of the warrant process. *Id.* at 533, 87 S. Ct. at 1733, 18 L. Ed. 2d at 938.

b. *Iowa Supreme Court cases dealing with searches of parolees and probationers under article I, section 8 of the Iowa Constitution.* We first considered searches of parolees in *Cullison,* in which a parole officer named Holmes went to the home of a parolee named Teeters after he did not show up for work. 173 N.W.2d at 534. After Teeters allowed Holmes in the messy apartment strewn with beer cans, Holmes asked to inspect a locked room, but Teeters refused. *Id.* at 534–35. Holmes obtained a master key but was still unable to open the door. *Id.* at 535. When Teeters became nervous and displayed a knife, Holmes left the apartment and returned later with the police chief. *Id.* An ensuing warrantless search of the locked room revealed stolen merchandise. *Id.*

Evaluating the case, we rejected theories of parole that diluted or stripped a parolee's constitutional search and seizure protections. *Id.* at 536–38. We observed these theories were based on an unpersuasive "socio-juristic rationalization, i.e., protection of the public and constructive custody." *Id.* at 536. We noted that, under article II, section 5 of the Iowa Constitution, a convicted person loses only the right to vote or hold office. *Id.* at 537. Accordingly, we concluded a parolee maintains search and seizure rights under the Iowa Constitution. *Id.* Bolstering this view, we cited *Camara* to stress that the determination of those situations that support a search must be made by a neutral magistrate and must be represented by a warrant. *Id.* at 538.

Interestingly, the parole officer in *Cullison* was engaged in a type of parole supervision, often contemplated to be within the context of the special-needs doctrine today, at least at the outset of the case. *See id.* at 534; *cf. Griffin,* 483 U.S. at 875, 107 S. Ct. at 3169, 97 L. Ed. 2d at 718.

Dissents from Justices Larson and Stuart argued that the operation of a parole system and the need to carry out the duties of a parole officer justified the search. *See Cullison*, 173 N.W.2d at 542–44 (Larson, J., dissenting); *id.* at 544 (Stuart, J., dissenting). Accordingly, these dissents seem to be grounded on a special need for parole officers to conduct warrantless searches. Justice Larson argued the parole system renders parole searches different from police searches: it gives parole officers the authority to supervise the parolee, and the parole officer's special status makes searches of parolees reasonable that would be unreasonable if conducted in relation to a person not on parole. *Id.* at 542–44 (Larson, J., dissenting). Because Holmes had a reasonable belief Teeters was violating parole, the dissent concluded the search was acceptable. *Id.* at 544. Justice Stuart's dissent argued that searches of parolees present an exception to the warrant requirement. *Id.* (Stuart, J., dissenting).

Impliedly answering the dissent, our majority in *Cullison* stated something germane to the resolution of this case: "[T]he fact that a criminal accused is also a parolee should not, as to a new and separate crime, destroy or diminish constitutional safeguards afforded all people. If convicted, the sentence will be in addition to that previously imposed." *Id.* at 538. As we strive to remain faithful to more than forty years of Iowa precedent, we acknowledge that we rejected the notion that parole supervision could justify a later, full-scale search for evidence of a new crime.

We recently renewed our consideration of searches of parolees in *Ochoa*, where a police officer searched a parolee and his motel room solely on the basis of Ochoa's parolee status. 792 N.W.2d at 262–63. We held the search of Ochoa and his motel room was unreasonable,

specifying that parolee status cannot alone provide the basis for a full-scale search. *Id.* at 291. In doing so, we rejected at least one recent case from the United States Supreme Court, *Samson*, which effectively rendered nugatory any constitutional search and seizure protections enjoyed by probationers and parolees. *Ochoa*, 792 N.W.2d at 291; *see also Samson,* 547 U.S. at 852, 126 S. Ct. at 2199, 165 L. Ed. 2d at 259. Yet, the case did not present an opportunity to specifically consider whether Iowa's parole system presented a special need to conduct a search without a warrant or probable cause. *Ochoa*, 792 N.W.2d at 286. But, later in the opinion, we stressed that any special-need exception under article I, section 8 would be limited. *Id.* at 288–89.

The concurring opinion in *Ochoa* discussed special-needs searches and suggested the limitation maintained in the majority opinion is accomplished by the link between the asserted special need in the parolee context and the rationale supporting special-needs searches generally. *Id.* at 294–95 (Cady, J., concurring specially). While legitimate reasons exist for maintaining intensive supervision of parolees, it was observed that searches could only be legitimate when performed by a parole officer in the context of the parole mission. *Id.* at 294. Neither the reasons attached to the parole mission nor the identity of the search agent are sufficient alone to justify the search; rather, it is the "confluence" of these two facts that would create a valid special need. *Id.*

c. *Academic commentary.* Some academic commentary has been favorable to applying the special-needs theory to parolees and probationers. Indeed, while older theories such as the "act of grace" and "waiver" theories of parole have been rejected as unsound, commentators tend to agree with the states that hold parolees have a reduced expectation of privacy, thereby making certain intrusions on parolee

privacy reasonable that would be unreasonable if directed at an ordinary person. 5 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 10.10(c), at 533 (2012) [hereinafter LaFave]. Other commentators disagree, however, and argue that, while compelling governmental interests may justify some particular intrusions in a special-needs context, generally undervaluing the parolee's privacy interests is inappropriate. Antoine McNamara, Note, *The "Special Needs" of Prison, Probation, and Parole*, 82 N.Y.U. L. Rev. 209, 243–46 (2007) [hereinafter McNamara]. These commentators argue that, like the municipal safety inspections at issue in *Camara*, the "only effective way" to ensure the rehabilitation of parolees and probationers is through a supervision regime that is not fully commensurate with ordinary constitutional search and seizure protections. *Id.* at 244; *see also* Welsh S. White, *The Fourth Amendment Rights of Parolees and Probationers*, 31 U. Pitt. L. Rev. 167, 183–84 (1969) [hereinafter White]; William J. Stuntz, *Implicit Bargains, Government Power, and the Fourth Amendment*, 44 Stan. L. Rev. 553, 580–81 (1992); Note, *Striking the Balance Between Privacy and Supervision: The Fourth Amendment and Parole and Probation Searches of Parolees and Probationers*, 51 N.Y.U. L. Rev. 800, 831–35 (1976) [hereinafter Note].

At least one commentator has pointed out that widespread use of warrantless and suspicionless searches of parolees irresponsibly invades not only the rights of parolees, but their families as well. *See* Note, 51 N.Y.U. L. Rev. at 816–17. As the commentator stated,

> Fourth Amendment protection will be diminished not only for parolees, but also for the family and friends with whom the parolee might be living. Those bystanders may find themselves subject to warrantless searches only because they are good enough to shelter the parolee, and they may therefore be less willing to help him—a sadly ironic result in

a system designed to encourage reintegration into society. Moreover, the demeaning effect of arbitrary intrusions into the parolee's privacy will be reflected in the attitudes of his relatives and friends. As a result, the parolee will suffer diminished feelings of self-worth, making his rehabilitation more difficult. In addition, warrantless parole officer searches may reinforce patterns of resentment to authority, and excessive external controls may inhibit the development of necessary internal controls: "a person must have the freedom to be responsible if he is to become responsibly free."

*Id.* (footnotes omitted) (quoting *People v. Mason*, 488 P.2d 630, 637 (Cal. 1971) (Peters, J., dissenting)). Moreover, as observed, these searches may impede the parolee's rehabilitative progress and development of a trusting relationship with their parole officer, particularly because the parolee is subjected to these searches in the presence of their family. *Id.* Even worse, these searches may ultimately encourage the families of parolees to turn out their reforming relatives at a time when the bonds of family are precisely what a reforming citizen needs. *Id.*

Some commentators disagree, not with the application of the special-needs doctrine to parolees and probationers, but with the scope of searches considered acceptable under its rubric. *See* White, 31 U. Pitt. L. Rev. at 186–99. Thus, while increased use of frisks, drug tests, and house visits might be justifiable under a special-needs theory, full-scale searches—whether conducted by parole officers or general law enforcement officers—are not.[5] *Id.* Stated differently: "If a parole or

---

[5]Justice Blackmun advanced a similar argument in his *Griffin* dissent. *See Griffin*, 483 U.S. at 881, 107 S. Ct. at 3172, 97 L. Ed. 2d at 722 (Blackmun, J., dissenting). Justice Blackmun's principled view of special-needs searches forms the basis of his argument:

"[O]nly when the practical realities of a particular situation suggest that a government official cannot obtain a warrant based upon probable cause without sacrificing the ultimate goals to which a search would contribute, does the Court turn to a 'balancing' test to formulate a standard of reasonableness for this context."

probation search does not further rehabilitation, then its sole purpose is law enforcement, and it cannot qualify for the special needs exception." McNamara, 82 N.Y.U. L. Rev. at 244.

Professor White argued that parole officers will have somewhat greater leeway to search a parolee's home than an ordinary citizen's because some behavior of the parolee—such as drinking or changing residence without first obtaining approval from the parole officer—is prohibited by the parole agreement. White, 31 U. Pitt. L. Rev. at 196. Nonetheless, even in these situations, White would require the parole officer to obtain a warrant based on probable cause from a neutral judicial officer. *Id.* at 195–97. White thus disagrees with the *Griffin* Court, arguing that a neutral magistrate is in a better position to accommodate the rights of parolees and the concerns of the public. *Id.* at 196–97. The uncontrolled discretion of the parole officer is as much of a subject of legitimate worry as the uncontrolled discretion of general law enforcement officers. *See id.* LaFave has reflected favorably upon the balance struck by White. *See* 5 LaFave at 536–38.

Finally, some commentary has attacked the very concept of special-needs searches. For instance, it has been suggested that the

---

*See id.* (quoting *O'Connor v. Ortega*, 480 U.S. 709, 741, 107 S. Ct. 1492, 1511, 94 L. Ed. 2d 714, 738 (1987) (Blackmun, J., dissenting)). In Justice Blackmun's view, while probation presents special needs, it did not do so uniformly. *See id.* at 883–84, 107 S. Ct. at 3173–74, 97 L. Ed. 2d at 723–24. An "ordinary home visit" to check in on the progress of the probationer's rehabilitation presents a special need justifying an alternative to the warrant requirement, but a full-scale search for evidence in a criminal investigation would not. *See id.* Furthermore, full-scale criminal searches may not promote a close relationship between the probation officer and the probationer and may in fact inhibit the development of the relationship. *See id.* at 886, 107 S. Ct. at 3175, 97 L. Ed. 2d at 725–26. Of course, the warrant requirement does not frustrate the valid purposes of parole searches in all circumstances in which case the special-needs doctrine should be unavailable altogether. *See cf.* at 883–84, 107 S. Ct. at 3173–74, 97 L. Ed. 2d at 723–24.

special-needs doctrine developed by the United States Supreme Court in *Camara* and *Terry v. Ohio*, 392 U.S.1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), is unworkable. *See* Scott E. Sunby, *A Return to Fourth Amendment Basics: Undoing the Mischief of* Camara *and* Terry, 72 Minn. L. Rev. 383, 406–14 (1988). This line of thinking suggests that the probable cause requirement should be enforced through recognizing a distinction between initiatory and responsive searches and that a strict scrutiny standard should be applied to warrantless initiatory searches. *See id.* at 425–27, 436–38, 442–45.

d. *Determination of the validity of the search of Kern's home under article I, section 8 of the Iowa Constitution.* While the landscape of the special-needs doctrine as articulated by the United States Supreme Court under the Fourth Amendment has been expanded considerably since our decision in *Cullison,* it is unnecessary for us to specifically decide today whether the doctrine is viable in the context of parole under the Iowa Constitution. First, the need for new legal doctrines is best considered when facts exist in a case to support an application of the doctrine in a way that reveals its purpose and rationale. Second, it is often helpful to adopt legal doctrines when experts and others in a particular field of study have provided testimony and evidence in the case of the practical need for the doctrine and the particulars of its operation.

But, even if we were to recognize the existence of a special-needs exception in the context of parole under the Iowa Constitution, we reiterate that an obvious limitation would be for the doctrine to apply to searches conducted by parole officers consistent with the parole mission. *See Ochoa,* 792 N.W.2d at 286. This limitation has nothing to do with the presence of police necessary to protect the safety of a parole officer

during a search, but with police presence that shifts the purpose of the search from the goals of parole that support the special need to search to the goals of general law enforcement. *See id.* This limitation is consistent with the general contours of the doctrine developed by courts in other jurisdictions and would be consistent with our limited consideration of the doctrine. *See, e.g., United States v. Consuelo-Gonzalez,* 521 F.2d 259, 266 (9th Cir. 1975) (rejecting a search of a probationer's home conducted by general law enforcement officers because whatever "special and unique" interest probation officers have "does not extend to law enforcement officers generally"); *United States v. Hallman,* 365 F.2d 289, 292 (3d Cir. 1966) ("The veil afforded by Provenzano's position as Hallman's parole officer cannot here serve as a shield against what was plainly the action of the arresting officers to effect an illegal search."); *Ochoa,* 792 N.W.2d at 286, 288–89. The special-needs doctrine simply cannot be used by police to make an end-run around the constitutional protections otherwise available to parolees. *See Ochoa,* 792 N.W.2d at 286, 291 (declining to consider whether the special-needs doctrine applied to a search by a police officer and holding police cannot search a parolee based on status alone); *Cullison,* 173 N.W.2d at 537 (holding parolee's constitutional search and seizure rights are not diluted by the fact of being on parole). By any approach consistent with our foundational caselaw, the doctrine would require that the search by a parole officer be designed to fit the special needs of parole officers that would justify an intrusion into the house without probable cause or a warrant. *See Ochoa,* 792 N.W.2d at 294–95 (Cady, J., concurring specially).

In this case, the search failed to fit the special-needs rubric for two reasons. First, the search was significantly entangled with a larger law

enforcement operation and primarily served general law enforcement goals, suggesting the special-needs rationale should not be available at all.[6] *See Ferguson v. City of Charleston*, 532 U.S. 67, 79 & n.15, 121

---

[6]On appeal, the State also argues a balancing of Kern's reasonable expectation of privacy and the State's interest in either crime prevention or parole supervision allows her home to be searched with only reasonable suspicion; a result the United States Supreme Court has reached both in the special-needs context, *see Griffin*, 483 U.S. at 875–76, 107 S. Ct. at 3169, 97 L. Ed. 2d at 718–19 (holding that Wisconsin's maintenance of a probation system constitutes a special need, justifying departure from the ordinary warrant and probable cause requirement of the Fourth Amendment), and the general law enforcement context, *see Knights*, 534 U.S. at 121, 122 S. Ct. at 592, 151 L. Ed. 2d at 506 (holding a Fourth Amendment balancing test permitted a warrantless search of a probationer's home based on reasonable suspicion). The State bases its argument on language in *Ochoa*. *See* 792 N.W.2d at 291 ("We have no occasion to consider . . . the potential application of special needs to searches of parolees conducted by *parole officers* [or] whether individualized suspicion amounting to less than probable cause may be sufficient in some contexts to support a focused search . . . ."). Kern replies that we actually rejected not just *Samson*'s results (permitting warrantless, suspicionless searches of parolees) but also the generalized balancing approach it employed to achieve those results.

The generalized balancing test employed in *Knights* appears to be very similar, if not identical, to the one employed in *Griffin* after determining a special need exists. *Compare Knights*, 534 U.S. at 119–21, 122 S. Ct. at 591–92, 151 L. Ed. 2d at 505–07, *with Griffin*, 483 U.S. at 875–76, 107 S. Ct. at 3169, 97 L. Ed. 2d at 718–19; *see also T.L.O.*, 469 U.S. at 351, 105 S. Ct. at 747, 83 L. Ed. 2d at 740 (Blackmun, J., concurring) (writing separately because the majority's opinion engaging in a balancing test "omits a crucial step in its analysis"). *Knights* itself appears to draw a close link between the application of the special-needs and generalized reasonableness doctrines, yet disclaims application of the special-needs doctrine. *See* 534 U.S. at 117, 122 S. Ct. at 591–92, 151 L. Ed. 2d at 504–05. The Court held that the search condition of probation "significantly diminished Knights' reasonable expectation of privacy." *Id.* at 120, 122 S. Ct. at 592, 151 L. Ed. 2d at 505. It considered the condition to "the salient circumstance" in a " 'totality of the circumstances' " analysis, *id.* at 118, 122 S. Ct. at 591, 151 L. Ed. 2d at 505 (quoting *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S. Ct. 417, 421, 136 L. Ed. 2d 347, 354 (1996)), failing to consider either the issue of the voluntariness of Knights's acceptance of the parole condition or Knights's privacy interest in his home. In its discussion of balancing in this case, the State makes a similar argument regarding the mandatory search condition in Kern's parole agreement. Of course, in *Baldon*, we concluded a mandatory search condition of parole did not establish voluntary consent on the part of the parolee to conduct a search. *See* 829 N.W.2d at 802–03.

However, the State's assertion that the facts surrounding the two encounters in this case "gave the parole officer, Sergeant Garvey, the authority to search the premises" suggests the State was arguing special needs, not generalized reasonableness balancing. The State then argues Garvey properly delegated his authority to Officers Chance and Jenkins. We construe this argument as a second layer of the State's

S. Ct. 1281, 1289 & n.15, 149 L. Ed. 2d 205, 217 & n.15 (2001). The evidence supported the conclusion that the police conducted the search for their purposes, not the purposes of parole. *See Ochoa*, 792 N.W.2d at 286. Police sought to conduct a search to investigate suspicion of criminal activity and then engaged in the search for the same purpose. *See id.* Second, nothing about the search at issue in this case, other than Kern's status as a parolee, suggested the warrant requirement was impractical or would "frustrate the governmental purpose behind the search." *See Camara*, 387 U.S. at 533, 87 S. Ct. at 1733, 18 L. Ed. 2d at 938; *cf. Ochoa*, 792 N.W.2d at 291 (holding parole status alone may not justify a warrantless, suspicionless search). The officers who conducted the search even acknowledged in their testimony at the suppression hearing that it would have been feasible to request a search warrant. *See Camara*, 387 U.S. at 533, 87 S. Ct. at 1733, 18 L. Ed. 2d at 938; *see also Almeida-Sanchez v. United States*, 413 U.S. 266, 283, 93 S. Ct. 2535, 2544–45, 37 L. Ed. 2d 596, 609 (1973) (Powell, J., concurring) ("[I]nconvenience alone has never been thought to be an adequate reason for abrogating the warrant requirement."). Of course, as a search that from all accounts appeared to be motivated by the interests of law enforcement, there was no evidence to explain how the special needs of

---

special-needs argument. In other words, the State asks us to hold that if a special need exists, parole officers should be able to conduct full-scale searches of parolees' homes without a warrant supported by probable cause, so long as the parole officer has reasonable suspicion the parolee has broken the law or violated parole. Thus, the State's argument does not just ask us to apply the reasonable-suspicion standard to a search by law enforcement, but utilizes the proffered special needs of parole to make its case. Because the record in this case is inadequate for us to decide whether Iowa's maintenance of a parole system presents a special need, it is similarly insufficient for us to determine whether (assuming parole presents a special need under article I, section 8) a subsequent balancing of the relative interests of Kern and the State permit a full-scale search of Kern's home by police officers with only reasonable suspicion.

parole might justify the search without a warrant or how the actions of police in conducting the search served the interests of parole. Consequently, the search in this case required a warrant supported by probable cause and issued by a neutral magistrate, absent a recognized exception.

Accordingly, because we do not recognize the special-needs doctrine under article I, section 8 in this case, we decline to depart from forty years of Iowa precedent and justify the search of the Kern house under that doctrine. Even if we did, however, under the search and seizure protection afforded parolees under article I, section 8 of the Iowa Constitution, the doctrine would not be available to justify a search instigated and dominated by the needs and interests of law enforcement.

3. *The community caretaking function.* We next consider if the community caretaking function justified the search. On this issue, Kern does not suggest a standard under article I, section 8 of the Iowa Constitution that is different from the standard employed by the United States Supreme Court under the Fourth Amendment. As a result, we use the federal substantive standard of community caretaking in this case, but reserve the right to apply that standard in a more stringent fashion than federal precedents. *See State v. Bruegger*, 773 N.W.2d 862, 883 (Iowa 2009).

The community caretaking function carried out by officers is an exception to the warrant requirement of the Fourth Amendment. *State v. Crawford*, 659 N.W.2d 537, 542 (Iowa 2003). A core notion of the community caretaking exception is that, like special needs, it is "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S. Ct. 2523, 2528, 37 L. Ed. 2d 706, 715 (1973). As

stated by another court: "The community caretaking function involves the duty of police officers to help citizens an officer reasonably believes may be in need of assistance." *State v. Mireles*, 991 P.2d 878, 880 (Idaho Ct. App. 1999). The determination of whether the community caretaking exception applies

> requires a three-step analysis: (1) was there a seizure within the meaning of the Fourth Amendment?; (2) if so, was the police conduct bona fide community caretaker activity?; and (3) if so, did the public need and interest outweigh the intrusion upon the privacy of the citizen?

*Crawford*, 659 N.W.2d at 543.

We have observed in the past that "the community caretaking exception encompasses three separate doctrines: (1) the emergency aid doctrine, (2) the automobile impoundment/inventory doctrine, and (3) the 'public servant' exception noted in *Cady*." *See id.* at 541; *see also* Mary E. Naumann, Note, *The Community Caretaker Doctrine: Yet Another Fourth Amendment Exception*, 26 Am. J. Crim. L. 325, 330–41 (1999). In cases such as this one, the first and third exceptions, which are very similar, are at issue. *See id.* To take advantage of the community caretaking exception in this context, the State must prove two things: First, the searching officer must be "actually motivated by a perceived need to render aid or assistance." *State v. Emerson*, 375 N.W.2d 256, 259 (Iowa 1985) (citation and internal quotation marks omitted), *abrogated on other grounds by Horton v. California*, 496 U.S. 128, 110 S. Ct. 2301, 110 L. Ed. 2d 112 (1990), *as recognized by State v. Lyman*, 776 N.W.2d 865, 872 (Iowa 2010). Second, the officer's motivation must be such that a "reasonable person under the circumstances would have thought an emergency had existed." *Id.* (citation and internal quotation marks omitted).

At first glance, the community caretaking function does not primarily focus on searches. Rather, the exception most often works to authorize seizures. *See, e.g., State v. Moore*, 609 N.W.2d 502, 503–04 (Iowa 2000) (holding a park ranger's stop of a vehicle to urge them to slow down was reasonable); *State v. Mitchell*, 498 N.W.2d 691, 693–94 (Iowa 1993) (holding a trooper's stop of a vehicle with a burned-out taillight was reasonable). *Cady*, however, did involve a search of an automobile. 413 U.S. at 437, 93 S. Ct. at 2526, 37 L. Ed. 2d at 712. The aim of the search in *Cady*, however, was not to search for evidence of any crime, but to search for defendant's service revolver after a car accident. *Id.* The defendant in *Cady* was a Chicago police officer who had been involved in a car accident. *Id.* The aim of the police, who believed Chicago police officers were required to carry their firearms at all times, was to remove the defendant's revolver from the vehicle before it was towed away. *Id.* In conducting the search, the police found some blood spatters in plain view, and the defendant later directed the police to the location of a body. *Id.* The community caretaking exception has similarly justified searches in Iowa cases. *See, e.g., State v. Carlson*, 548 N.W.2d 138, 142–43 (Iowa 1996) (holding entry into a home to search for a missing person, after the person's boyfriend gave conflicting information about the missing person's whereabouts, was reasonable under the emergency aid exception); *State v. Kersh*, 313 N.W.2d 566, 568–69 (Iowa 1981) (holding that officer was justified in opening a car door to check on the condition of the defendant, who was slumped over the wheel), *abrogated on other grounds by State v. Lake*, 476 N.W.2d 55, 56 (Iowa 1991).

Nevertheless, the exception does not apply in this case. The caretaking by the police in accompanying the DHS officer to Kern's home

ended when the DHS officer and the police officers removed the children from the home. If the rationale of the community caretaking exception is to help either the subject of the search or, as in *Cady*, the public at large (from the danger of an unattended firearm in an impounded vehicle), then the community caretaking function was no longer served in this case once the children were removed. After the children were removed, the point of the search of Kern's home was not to assist any member of either the household or the public, but was to search for evidence of a crime. The officers neither had the requisite motivation, nor would a reasonable person believe that an emergency existed. *See Emerson*, 375 N.W.2d at 259. Accordingly, the community caretaking function did not justify the search in this case under either the Fourth Amendment or article I, section 8 of the Iowa Constitution.

4. *Exigent circumstances.* The State further argues that exigent circumstances justified the warrantless search of Kern's home. Kern responds that nothing in the record supports application of the exigent-circumstances exception to the warrant requirement of the Fourth Amendment and article I, section 8. As with the community caretaking exception, Kern does not articulate a different substantive standard for analysis of the exigent-circumstances exception under article I, section 8 of the Iowa Constitution than is applied by the United States Supreme Court under the Fourth Amendment. We therefore apply the federal standard in this case, but reserve the right to apply it in a more stringent fashion than under federal law. *Bruegger*, 773 N.W.2d at 884.

An exception to the warrant requirement exists for a search "based on probable cause and exigent circumstances." *State v. Naujoks*, 637 N.W.2d 101, 108 (Iowa 2001). To be clear, this exception only applies "when coupled with existing probable cause." *State v. Strong*, 493

N.W.2d 834, 836 (Iowa 1992). "The standard for probable cause is whether a person of reasonable prudence would believe a crime has been committed or that evidence of a crime might be located in the particular area to be searched." *Naujoks*, 637 N.W.2d at 108.

The exigent-circumstances exception includes a situation in which there is a "probability that, unless immediately seized, evidence will be concealed or destroyed." *Id.* The exigent-circumstances exception is important to narcotics investigations because drugs are "easily destroyed." *See id.* at 109. For example, in *Strong*, this court considered whether the involuntary pumping of a suspect's stomach to find evidence of cocaine, which was rapidly metabolized by the suspect's body, qualified as exigent circumstances sufficient to relieve the warrant requirement. 493 N.W.2d at 835. Importantly, the police actually saw the defendant orally ingest the cocaine, after which Strong admitted the materials he had just swallowed were cocaine. *Id.* at 835.

Turning to the case at hand, we first consider if the officers had sufficient evidence to support probable cause. The probable cause determination relied on five pieces of information. First, an anonymous tip had been given two days earlier to a DHS officer, which alleged a marijuana grow operation existed in Kern and Grant's home. Second, Kern and Grant generally refused consent to search during the first encounter. Third, Grant maintained a defensive posture to prevent the officers from going further into Kern's home during the first encounter. Fourth, Kern and Grant refused to give consent after the DHS

investigator threatened to remove Kern's daughter and grandson from the home.[7] Finally, Kern was a parolee.[8]

An anonymous tip, alone, does not ordinarily contain sufficient indicia of reliability to provide reasonable suspicion, let alone probable cause. *See Florida v. J.L.,* 529 U.S. 266, 270–72, 120 S. Ct. 1375, 1378–79, 146 L. Ed. 2d 254, 260–61 (2000). On the other hand, a significantly corroborated and verified anonymous tip has been held sufficient by the United States Supreme Court under the Fourth Amendment. *Alabama v. White,* 496 U.S. 325, 331–32, 110 S. Ct. 2412, 2416–17, 110 L. Ed. 2d 301, 309–10 (1990). In *Griffin,* the Court considered a tip from a police officer to a parole officer that a probationer "had or might have guns" sufficient to support reasonable suspicion. 483 U.S. at 879–80, 107 S. Ct. at 3171–72, 97 L. Ed. 2d at 721–22. Yet, the Court acknowledged the tip would not support probable cause. *Id.* at 878, 107 S. Ct. at 3171, 97 L. Ed. 2d at 720; *see also Adams v. Williams,* 407 U.S. 143, 147, 92

---

[7]Approximately a week later, DHS Officer Huisman followed up with Kern's daughter. During that meeting, Kern's daughter revealed she was aware that marijuana was being grown in, and sold out of, the house. She also told Huisman that marijuana was being consumed in the house. This information was not available to the officers prior to the search. Accordingly, we do not consider it in determining whether sufficient suspicion or cause existed to conduct a full search of the home. Courts assessing whether official action was reasonable do not consider facts not actually known to the officers. *See Terry,* 392 U.S. at 21–22, 88 S. Ct. at 1880, 20 L. Ed. 2d at 906 (indicating the relevant inquiry is whether "*the facts available to the officer at the moment of the seizure or the search* 'warrant a man of reasonable caution in the belief' that the action taken was appropriate" (emphasis added)); *United States v. Porter,* 594 F.3d 1251, 1258 n.9 (10th Cir. 2010) (discussing suspicious facts, but ultimately not considering them because the facts "were not known to the police officers"); *see also Devenpeck v. Alford,* 543 U.S. 146, 152, 125 S. Ct. 588, 593, 160 L. Ed. 2d 537, 544 (2004); *Graham v. Connor,* 490 U.S. 386, 396, 109 S. Ct. 1865, 1872, 104 L. Ed. 2d 443, 455 (1989) ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.").

[8]The record does not indicate whether either the officers or Kern's parole officer were aware of the exact charges on which Kern had been previously convicted.

S. Ct. 1921, 1924, 32 L. Ed. 2d 612, 617 (1972) (noting an unverified tip would usually not support probable cause for a search or arrest).

Furthermore, neither the invocation of constitutional rights nor the refusal to grant consent to an officer to perform a search can be used alone to support either reasonable suspicion or probable cause. *See State v. Maddox*, 670 N.W.2d 168, 173 (Iowa 2003).[9] In the words of the 10th Circuit:

> Any other rule would make a mockery of the reasonable suspicion and probable cause requirements, as well as the consent doctrine. These legal principles would be considerably less effective if citizens' insistence that searches and seizures be conducted in conformity with constitutional norms could create the suspicion or cause that renders their consent unnecessary.

*United States v. Hunnicutt,* 135 F.3d 1345, 1351 (10th Cir. 1998).

We agree. If such a refusal of consent or invocation of constitutional rights could supply officers with the requisite suspicion or cause to conduct a search, then citizens would be exposed to a dangerous catch-22 when officers request consent to conduct a search. If consent is given, the search occurs. If consent is refused, the officer may nevertheless conduct the search pursuant to the probable cause generated by the refusal. This is an unacceptable consequence under our constitutional framework.

---

[9]Similarly, the Supreme Court has held in the general Fourth Amendment context, "a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." *Florida v. Bostick*, 501 U.S. 429, 437, 111 S. Ct. 2382, 2387, 115 L. Ed. 2d 389, 400 (1991). An analogous notion is well-established in the Fifth Amendment context as well. *See Doyle v. Ohio*, 426 U.S. 610, 617–18, 96 S. Ct. 2240, 2244–45, 49 L. Ed. 2d 91, 97–98 (1965) (considering postarrest silence "insolubly ambiguous" and holding prosecution may not comment on postarrest silence at trial as evidence of guilt); *Griffin v. California*, 380 U.S. 609, 613–14, 85 S. Ct. 1229, 1232–33, 14 L. Ed. 2d 106, 109–10 (1965) (holding prosecution may not comment on defendant's decision not to testify at trial).

We have similar doubts about the value of Grant's defensive posture as a factor in the probable cause determination. Furtive behavior may be a proper consideration. *See Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S. Ct. 673, 676, 145 L. Ed. 2d 570, 576 (2000); *United States v. Sokolow*, 490 U.S. 1, 8–9, 109 S. Ct. 1581, 1586, 104 L. Ed. 2d 1, 10–11 (1989). But, a defensive posture by an occupant of a home in response to an intrusion by police is not indicative of probable cause of a crime. A homeowner may want personal matters within the privacy of the home protected from unwanted disclosure. The desire of a homeowner to keep police from entering beyond the threshold of the house during an unannounced visit is not probable cause the home contains evidence of a crime.

As to the parole status of Kern, *Ochoa* prohibits using Kern's status as a parolee to augment the suspicion held by the officers such that it alone could amount to probable cause. *See* 792 N.W.2d at 291.

Thus, we conclude the officers did not have probable cause to search the Kern home. Additionally, nothing about the circumstances of this case (other than the inherent destructibility of drugs) suggests that the circumstances were exigent. The DHS received the anonymous tip on November 3, but the home visit did not occur until November 5. Even on November 5, the only circumstances conveying exigency in the moment were Kern's walk to her car in the driveway and the officers' conjecture that, by invoking her search and seizure rights, Kern was affirmatively hiding something.

While walking out to the car arguably raises some suspicion that destruction of evidence was imminent, and the United States Supreme Court has supported fairly conjectural applications of the exigent-circumstances exception before, *see Illinois v. McArthur*, 531 U.S. 326,

330–31, 121 S. Ct. 946, 949–50, 148 L. Ed. 2d 838, 847 (2001), the instant case is distinguishable on two critical grounds. First, *McArthur* dealt not with an uncorroborated, anonymous tip, but rather the in-person assertion of the defendant's wife whose reliability was readily ascertainable. *Id.* at 329, 332, 121 S. Ct. at 949, 950, 148 L. Ed. 2d at 846, 848. She could be "held responsible if her allegations turn[ed] out to be fabricated." *See J.L.*, 529 U.S. at 270, 120 S. Ct. at 1378, 146 L. Ed. 2d at 260. Second, *McArthur* involved the comparatively minimal intrusion of refusing to allow the defendant to reenter his trailer home unsupervised while an officer obtained a warrant, *see* 531 U.S. at 329, 332, 121 S. Ct. at 949–50, 148 L. Ed. 2d at 846, 848, while in this case the officers conducted a full-blown search of the defendant's home.

That is not enough either for probable cause or for a finding of exigent circumstances. Accordingly, we hold that exigent circumstances did not justify the warrantless search of Kern's home conducted in this case under both the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution.

### V. Conclusion.

We conclude no exception to the warrant requirement of article I, section 8 of the Iowa Constitution justifies the warrantless search of Kern's home. Accordingly, the evidence of marijuana seized from the home should have been suppressed. We reverse the judgment and sentence of the district court and remand for a new trial on the count of conspiracy to manufacture a controlled substance.

**REVERSED AND REMANDED.**

All justices concur except Mansfield and Waterman, JJ., who concur in part and dissent in part.

**MANSFIELD, Justice (concurring in part and dissenting in part).**

I concur in Part III of the majority opinion.  However, I dissent from Part IV of the court's opinion and believe the search should be upheld for the reasons set forth in my dissenting opinion in *State v. Baldon*, ___ N.W.2d ___, ___, 2013 WL 1694553, at *44 (Iowa 2013) (Mansfield, J., dissenting).  Accordingly, unlike the majority, I do not need to reach the community caretaking exception, the exigent-circumstances exception, the special-needs exception, or reasonable suspicion.  All of these are potential alternative grounds for upholding the search of Kern's home.

Having said that, I wholeheartedly endorse the majority's discussion of the first two of these issues.  In the course of a few pages, the majority carefully applies the relevant Iowa and United States Supreme Court precedents.  It concludes that this case involves neither community caretaking nor exigent circumstances as defined in the caselaw.  I agree with the majority's treatment of these two matters.

Unfortunately, the majority's discussion of special needs is missing the same focus and faithfulness to precedent.  Just a decade ago, we applied that doctrine in rejecting a challenge to a search of a school locker under both the Fourth Amendment and article I, section 8.  *See State v. Jones*, 666 N.W.2d 142, 145–50 & n.2 (Iowa 2003).  Thus, we have recognized special needs as an exception to the warrant requirement under the Iowa Constitution.

In a footnote, my colleagues downplay *Jones* because it "featured no independent analysis of the Iowa Constitution" and "was limited to an examination of what the United States Supreme Court had said on the subject."  I would categorically reject any suggestion that the worthiness

of our state constitutional precedents depends on the extent to which they *depart from* federal constitutional precedent.

While the majority relegates *Jones* to a footnote, it devotes considerable attention to *State v. Cullison*, a case we decided over forty years ago under the Fourth Amendment, not article I, section 8. *See* 173 N.W.2d 533 (Iowa 1970). My colleagues mislabel *Cullison* as an "Iowa Supreme Court case[] dealing with searches of parolees and probationers under article I, section 8 of the Iowa Constitution." In fact, the opinion contains no reference to that provision. *Cullison*, rather, was our court's effort to determine the scope of "an Iowa State parolee's Fourth Amendment rights, privileges and immunities." *Id.* at 537. We expressly noted the absence of any United States Supreme Court precedent on point. *Id.* at 535. Although *Cullison*, as a 1970 Fourth Amendment precedent, has been superseded by later United States Supreme Court Fourth Amendment decisions, my colleagues try to reincarnate it as a decision on the meaning of Iowa's search and seizure clause. *See generally Baldon*, ___ N.W.2d at ___, 2013 WL 1694553, at *50 & n.49 (further discussing why *Cullison* does not bear upon article I, section 8).

Not only is the majority's survey of Iowa special-needs precedent historically inaccurate, its discussion is unnecessary and will introduce further uncertainty into Iowa search and seizure law. One can hold under existing Fourth Amendment precedent that the special-needs doctrine does not apply because the search was strictly a law enforcement operation. It was conducted in the absence of a parole officer and was not in furtherance of a parole mission. *See Ferguson v. City of Charleston*, 532 U.S. 67, 79 & n.15, 121 S. Ct. 1281, 1289 & n.15, 149 L. Ed. 2d 205, 217 & n.15 (2001); *Griffin v. Wisconsin*, 483 U.S. 868, 873–74, 107 S. Ct. 3164, 3168, 97 L. Ed. 2d 709, 717 (1987).

If required to reach the special-needs exception, that would be my conclusion.

The majority's discussion of reasonable suspicion is also a puzzler for me. The State's position here is straightforward: Even if a warrantless, suspicionless search of a parolee is deemed impermissible under article I, section 8, a search based on *reasonable suspicion* should be allowed. This is a serious argument, and we expressly left it open in *State v. Ochoa. See State v. Ochoa*, 792 N.W.2d 260, 291 (Iowa 2010) ("We have no occasion to consider other questions, such as . . . whether individualized suspicion amounting to less than probable cause may be sufficient in some contexts to support a focused search . . . ."). We also left it open in *Baldon. See Baldon*, ___ N.W.2d at ___, 2013 WL 1694553, at *4 (majority opinion) (noting that the State made no argument "that a balancing test under article I, section 8 would weigh in favor of the State" and introduced no evidence of "any particular need . . . to search Baldon . . . predicated on individual suspicion").

In six pages of its appellate brief in this case, the State argues clearly and succinctly that based on logic and precedent, reasonable suspicion should be a sufficient ground for searching a parolee. It also argues that reasonable suspicion was present here. The State uses the phrase "reasonable suspicion" nine times in the course of these six pages. Kern then replies to the State's argument for four pages in her reply brief. She contends that reasonable suspicion to search the house did not exist.

Now, however, in a long footnote, my colleagues avoid the issue that the parties have presented to them. Instead, they recharacterize the State's reasonable-suspicion argument as just a "second layer" of its special-needs argument. This allows my colleagues not to address it.

But it is a separate argument, and we said so in *Ochoa*.  *See* 792 N.W.2d at 291 (identifying "(1) the potential application of special needs to searches of parolees conducted by *parole officers*" and "(2) whether individualized suspicion amounting to less than probable cause may be sufficient in some contexts to support a focused search" as two questions not answered by the court's opinion).

I would address the reasonable-suspicion issue by applying established Fourth Amendment precedent.  In *United States v. Knights*, the United States Supreme Court held unanimously that reasonable suspicion was a sufficient basis to conduct a warrantless search of a probationer's house.  *See* 534 U.S. 112, 121, 122 S. Ct. 587, 592, 151 L. Ed. 2d 497, 506 (2001).  *Knights* is not a special-needs case; the search was conducted by a detective, with no involvement by anyone who was responsible for supervising the defendant's probation.  *Id.* at 115, 122 S. Ct. at 589, 151 L. Ed. 2d at 503.  Thus, *Knights* confirms that special needs and reasonable suspicion are two distinct possible grounds for sustaining a search of a probationer (or by inference, a parolee).  *See id.* at 117–18, 122 S. Ct. at 590–91, 151 L. Ed. 2d at 504.  However, *Knights* has no applicability when reasonable suspicion did not exist.

Reasonable suspicion was not present here.  At the time of the search of Kern's home, the police had only the anonymous tip that marijuana was being grown and processed in the house, plus the occupants' refusal to consent to a search.  As noted by my colleagues, an anonymous tip without any indicia of reliability generally does not amount to reasonable suspicion.  *See Florida v. J.L.*, 529 U.S. 266, 271, 120 S. Ct. 1375, 1379, 146 L. Ed. 2d 254, 260–61 (2000) (holding that "the bare report of an unknown, unaccountable informant" did not amount to reasonable suspicion for a *Terry* stop); *Alabama v. White*, 496

U.S. 325, 329, 110 S. Ct. 2412, 2415–16, 110 L. Ed. 2d 301, 308 (1990) (indicating that an anonymous tip standing alone would not normally provide reasonable suspicion for a *Terry* stop). And I also share my colleagues' view that Kern's and Grant's refusals to *consent* to a search cannot provide a *basis* for a search. *See State v. Maddox,* 670 N.W.2d 168, 173 (Iowa 2003) ("[M]ere refusal to consent to a search does not establish probable cause."); *State v. Ripperger,* 514 N.W.2d 740, 746 (Iowa Ct. App. 1994) ("The defendant's refusal to consent to a blood test cannot be used to support probable cause because such use denies the defendant's Fourth and Fifth Amendment rights.").

In summary, I agree with the majority's determinations on sufficiency of the evidence. I would affirm the district court's denial of Kern's motion to suppress for reasons already stated in my *Baldon* dissent. Additionally, I agree with the majority's handling of the community caretaking and exigent-circumstance exceptions, but disagree with its handling of the special-needs and reasonable-suspicion matters.

Waterman, J., joins this concurrence in part and dissent in part.