# IN THE COURT OF APPEALS OF IOWA

No. 14-0076
Filed June 10, 2015

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**JOHN MATTHEW MILDER,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Clinton County, Mark J. Smith,

Judge.

        John Milder appeals from his conviction of manufacturing/conspiring to

manufacture methamphetamine. **REVERSED AND REMANDED.**

        Courtney T. Wilson of Gomez May LLP, Davenport, for appellant.

        Thomas J. Miller, Attorney General, Sharon K. Hall, Assistant Attorney

General, Mike Wolf, County Attorney, and Amanda W. Myers, Assistant County

Attorney, for appellee.

        Heard by Danilson, C.J., and Vaitheswaran and Doyle, JJ.

**DANILSON, C.J.**

John Milder appeals his conviction of manufacturing/conspiracy to manufacture methamphetamine, in violation of Iowa Code section 124.401(1)(c)(6) (2011).[1] He contends his trial counsel was ineffective in failing to object to the jury instructions, which did not set out the elements of the offense of conspiracy to manufacture a controlled substance. Milder also contends the trial court erred in giving a supplemental jury instruction.

In light of the State's concession that trial counsel breached an essential duty and the trial court's failure to instruct on more than one element of the conspiracy alternative charge, we have a fundamentally unfair proceeding and we are not confident in its result. Because we cannot uphold Milder's conviction on these flawed instructions and trial counsel's failure to object to them, we reverse and remand for new trial.

**I. Background Facts and Proceedings.**

Suspecting the manufacturing of methamphetamine, on July 2, 2013, at about 7 a.m., several law enforcement officers executed a search warrant for the residence of Scott Richardson at 2802 Highway 67, Camanche, Iowa. Scott Richardson was present, as was John Milder. Officers seized and/or photographed drug paraphernalia, suspected HCL generators, salt, a coffee filter with residue, lithium battery parts, sulfuric acid, sodium hydroxide, and an empty can of Coleman camping fuel. As a result of the search and statements made by persons facing their own criminal charges, Milder was charged with violating

---

[1] The original allegations provided dates of January 1 through July 1, 2013. However, the State was allowed to amend the allegations to extend the relevant dates from July 2012 through July 1, 2013. Thus, the code in effect was the 2011 Iowa Code.

Iowa Code section 124.401(1)(c)(6), which prohibits the manufacture, or conspiring to manufacture, methamphetamine. A jury trial was held on December 2-5, 2013.

Earlier that year, on January 18, 2013, Camanche Reserve Officers Nathan Petersen and Kyle Kampe went to 519 13th Avenue in Camanche to speak with Milder. Upon arriving at the residence, the officers were met by Jim Carpenter, who stated Milder had moved out about a month previously. Carpenter directed officers to a bedroom he said Milder had stayed in. In the room, the officers observed "a baby crib that was somewhat in pieces, there was a dresser, parts of a coffee pot and not much else." Officer Petersen stated they did locate on a dresser in the bedroom a pill bottle bearing the name of Stephanie Cook, which contained a whitish substance. The officers knew Cook as Milder's girlfriend.

Carpenter allowed the officers to take three plastic bags of garbage from the porch of the residence. Upon returning to the police department, the officers opened the three garbage bags. Inside those bags the officers found an empty box of pseudoephedrine, parts of a light bulb, a piece of an aluminum can with burnt residue, two razor blades, pieces of a syringe, an instant ice pack with the interior removed a manila envelope bearing the name of John Milder and postmarked March 6, 2012, a March 25, 2012 return of service form, medication bearing the name of Stephanie Cook, and four plastic bottles. The officers also found a Mountain Dew bottle with yellow electrical tape around it and a water bottle containing a substance.

Carpenter testified he had been living at 519 13th Avenue since September of 2012, and Henry Bartels, "an older gentleman . . . not in good health," resided there with him. Carpenter stated Milder, Cook, and their child had been living there when he first moved into the home and they moved out in January 2013. Carpenter testified the bags confiscated by the officers on January 18, 2013, contained trash from various rooms in the house, including his room, the living room, Bartels' room, and the porch. He had cautioned the officers there were syringes in the garbage bags, which he had found while cleaning, but "I can't really tell you if it came out of [Milder and Cook's] room or something I picked up cleaning out the closets and stuff." Carpenter stated the box of pseudoephedrine found in the trash could have belonged to him—"I get chronic pneumonia pretty much year round."

Comanche Police Sergeant Richard Schmitz Jr. testified he received training in methamphetamine investigations. In the summer and fall of 2012, Schmitz obtained access to the national precursor log registry, which gave him access to information about pseudoephedrine purchases. Schmitz testified pseudoephedrine is one of the main ingredients for manufacturing methamphetamine. In studying those purchases in the Camanche area, he learned of several people "associated with" Milder who purchased pseudoephedrine: Scott Richardson (who lived at 2802 Highway 67); Amber Wieseler and her boyfriend, Curtis Marquette ("bought an abundance of pseudoephedrine during the investigation"); Wieseler while in the company of Dallas Jamison and Scott Richardson; and Everett Clark (Milder's cousin) and his girlfriend, Carrie Loper. Schmitz testified:

All of the group, Loper—Carrie Loper, Everett Clark, purchased a lot on the same day or within a day or two of each other. I had accessed—or requested video of a lot of these pseudoephedrine purchases from Walgreens or Walmart, or wherever they took place. What I would do is take those pseudoephedrine purchases that I got off of that registry, the date and time for those, and then I would request the video from Walmart or Walgreens from that day and time. But what I would request was the video for not only the pseudoephedrine purchase, but also the entrances and exits to Walmart and the exterior video pointed back at the parking lot. That way I can tie the associates— because it only tracks—the pseudoephedrine purchases only track the people who are buying the Sudafed. It doesn't tell me the people who they're with at the time of those purchases. That's why I get all that extra video. And I would review that video to see who else was with them or the car that they were in to go there, or if that person purchased anything else that I could tell was used in the process of making meth, would tie all these people, the associates, together, so I knew how they were associated and where they were going.

Q. Did you ever view John Milder on any of these videos?
A. Not once.

Schmitz testified he in viewed the videos, and while two or more interested persons were seen together on various dates of purchase, Milder was not present when these other persons purchased pseudoephedrine. According to the registry, Milder had not purchased pseudoephedrine since December 2010.

Schmitz stated in 2012 he "was starting to piece all the associates together so I know who was associated with the pseudoephedrine purchases, trying to get a handle on who was involved in this conspiracy," and later in 2013 "we started seeing more traffic out at Scott Richardson's." Schmitz acknowledged on cross-examination that nothing found in the trash bags taken from 519 13th Avenue was submitted for fingerprinting. Schmitz also acknowledged that while he searched Richardson's cell phone, he found no text messages referring to pseudoephedrine purchases to Milder or anyone.

Special Agent Joshua Mulnix of the Iowa Division of Narcotics Enforcement testified he assisted with the July 2, 2013 search of 2802 Highway 67, going through burnt trash located in the garage of the residence and digging through a pile of old items that had been burned in the yard. While sorting through the pile, Mulnix pulled out items he believed may have been involved with manufacturing methamphetamine, including peeled lithium batteries, parts of what appeared to be a pseudoephedrine blister pack, a broken razor blade, as well as items of normal trash.

Deputy Steve Diesch of the Clinton County Sheriff's Office testified he assisted in making entry into the residence at 2802 Highway 67 on July 2, 2013. He testified that Milder was present inside the residence. Diesch stated he assisted in the search of the kitchen, dining room area, and rear bedroom of the residence. Inside the residence, he located coffee filters, a two-liter bottle, and a straw.

Curtis Marquette testified he had been charged with two felonies for "purchasing precursors and cooking methamphetamine" in "the same case." He entered into a plea bargain in which he agreed to plead guilty to possession of precursors and provide testimony in exchange for a lesser sentence. Marquette testified he was familiar with a house on 13th Avenue in Camanche where Milder and Cook lived. He testified that during the summer and fall of 2012, he purchased and dropped off boxes of pseudoephedrine at the 13th Avenue residence and an hour or more later would return for "finished product." He testified he used methamphetamine with Milder at that residence and he "believe[d]" he saw Milder manufacture methamphetamine one time. Marquette

testified further he stayed at Richardson's residence on occasion and Milder "stayed there quite a while." Marquette stated he manufactured methamphetamine with Milder at Richardson's on more than one occasion in 2013. Cross-examination established Marquette had previously lied under oath because he did not want to go to jail.

Amber Wieseler testified she was providing testimony because of a plea agreement. She had been charged with felony "conspiracy to manufacture and precursors" but pled guilty to possession of precursors and received a five-year suspended sentence. She stated she was a friend of Cook and visited her at the residence on 13th Avenue. Wieseler testified she did not provide Milder pseudoephedrine while at that address and did not see him manufacture methamphetamine there. However, she stated she did provide Sudafed to Milder at Richardson's residence and later would receive methamphetamine. Wieseler testified she observed Milder making methamphetamine at Richardson's on more than one occasion. She acknowledged she had earlier told police that she gave all the pseudoephedrine she purchased to "Jim and Heather."

Cory Determann of the Camanche Police Department was also involved in the July 2, 2013 search at 2802 Highway 67. He stated he searched the kitchen and dining area of the residence, as well as a bedroom. Inside that bedroom, Determann located two "legal documents"—one bearing the name of John Milder and the other Stephanie Cook. Also located on bunk beds inside that bedroom were garbage bags filled with what appeared to be men's clothes. Inside one of the bags, Determann found a Ragu spaghetti jar with a coffee filter and some

liquid in the bottom of it. He also found a plastic container with a white sludge in the bottom. No fingerprinting of the jar or plastic container was attempted.

Detective Steve Cundiff of the Clinton County Sheriff's Office testified he became involved with this case in February 2013 while working with the Iowa Department of Human Services, which was involved with Carrie Loper and Everett Clark. Loper and Clark were suspected of using methamphetamine and manufacturing methamphetamine in a residence in Charlotte, Iowa, where children were present. Cundiff testified Clark then moved to Richardson's residence at 2802 Highway 67, and Cundiff went to that address three times in 2013—Cundiff did not go inside the house. Cundiff stated that Milder was at that address on two of the three occasions Cundiff was there and Richardson and Clark were also present. Cundiff testified that on May 31, 2013, when he visited the residence, Milder indicated he had been living there and told Cundiff he could not search the premises without a warrant.

Special Agent Edward Sbertoli of the Division of Narcotics Enforcement for the State of Iowa testified he was present on July 2 when the search of 2802 Highway 67 in Camanche was executed. He testified that he assessed the residence, took a walk around the property, and eventually searched the area of a detached garage. Inside the garage, he located a wood-burning stove and found a plastic container with burnt charring. He also found part of second smaller "plastic vessel." Both containers appeared to contain a white sludgy-type substance. Sbertoli conducted a pH test on both bottles, and both bottles had either an acidic or slight acidic reaction, consistent with, but not dispositive of, a portion of the methamphetamine cooking process. A large bucket was next to

the stove. In the bucket were burnt and partially burnt items, including packaging from pseudoephedrine tablets and a Camanche Pharmacy bag. Sbertoli was called into a bedroom of the residence to collect a Ragu jar and plastic containers containing a sludgy substance that were found in a plastic grocery sack. From inside the Ragu jar, Sbertoli extracted and bagged a wet coffee filter. Sbertoli testified the wood-burning stove was not hot and there were no obvious signs of an active methamphetamine lab in the house when he arrived.

Nila Bremer of the Iowa Department of Public Safety, Division of Criminal Investigation, analyzed items of evidence submitted by the Camanche Police Department in this case and authored a report regarding her findings. Bremer analyzed one of the coffee filters retrieved from the July 2 search and found it contained methamphetamine.[2] She also found liquid in one of the containers retrieved was consistent with petroleum distillate. Bremer testified common examples of petroleum distillate are mineral spirits, paint thinner, and charcoal lighter fluid, which can be used in the manufacture of methamphetamine. A trace amount of methamphetamine was collected from a bottle. She also performed an analysis of a large glass sample jar obtained from the search, which contained an unknown liquid residue. She concluded the liquid and the solid in the jar contained chemical elements of sodium, chlorine, and sulfur, similar to what one would see in an HCL generator used in the process of manufacturing methamphetamine.

---

[2] She testified she did not test other coffee filters because they were in "close proximity," and if one tested positive, the others would as well.

Loper testified she was providing testimony as part of her plea agreement. Though originally charged with two felonies, with a possible sentence of fifteen years, she pled guilty to a lesser charge and received a suspended sentence. Loper testified Everett Clark was her ex-boyfriend who was in Oakdale awaiting imprisonment. Loper stated she met Milder through Clark; Milder and Clark were cousins. Loper also knew Marquette, Wieseler, and Richardson. Loper testified she first purchased pseudoephedrine to obtain methamphetamine in October 2012. She stated she provided Milder with a box of pseudoephedrine in the fall of 2012 and approximately two hours later he returned with methamphetamine for her personal use. Loper testified she and her two children joined Clark living with Richardson in mid to late March 2013 and stayed there until the end of May. She brought bunk beds to Richardson's house. Loper testified:

> Q. Okay. Now, did you ever observe John Milder manufacturing meth out at Scott Richardson's house? A. No, I've never observed him doing it. They were all in the back bedroom. I was out at the dining room table.
> Q. So you did not witness the whole process? A. No.
> Q. You said "they." Who are you speaking of, "they"? A. Scottie Richardson and Everett Clark.
> Q. You're talking about—was John not there, then? A. Yes. John Milder, too, was there.
> Q. He was there. Okay. Okay. What, exactly—you were sitting at the kitchen table? A. Yes.
> Q. Okay. So what, exactly, did you observe? A. Scottie— Scott Richardson and Everett Clark was running in and out. There was one time John did come out with a pop bottle with a tube out of it and he went into the other room. He come [sic] out to the kitchen and then he went back into the back bedroom.
> Q. When Scott and Everett were in and out, why were they in and out; do you know? A. They were getting stuff for John.
> Q. Okay. Did you see what kind of stuff they were getting? A. Coffee filters, cups.
> Q. Now, you indicated that they were in the back bedroom. Who was living in that bedroom? A. Scottie Richardson.

Q. And, now, would you have observed that this year, or would that have been in 2012? A. That would have been 2012.

Q. Okay. Do you remember, was that in the fall or winter of 2012, or do you remember? A. Fall.

Q. Now, did you ever witness Everett manufacturing without John? A. Yes.

Q. Okay. And where would that occur? A. Out at Scottie Richardson's.

Q. Okay. Would there be anybody assisting him? A. Curtis was there helping him and Scottie, and then, at that point in time, I was running back and forth, me and Scott Richardson was running back and forth to get them stuff.

She testified that she, along with Richardson, Clark, and Marquette, would together obtain precursors to manufacture methamphetamine. Loper testified she never observed Milder purchase any precursors but had used methamphetamine with him.

Randy Weimerskirch testified he had been married to Milder's sister, Jami Milder. On June 19, 2013, Camanche officers executed a search warrant at Weimerskirch's residence. Officers found no methamphetamine but observed Coleman fuel, butane fuel, drain cleaner, an aquarium hose, a pill crusher, isopropyl alcohol, cold packs, salt, lithium batteries, and Liquid Fire—all consistent with the manufacture of methamphetamine. Weimerskirch testified for the State under an immunity agreement to avoid charges involving the possession of precursors. Weimerskirch's criminal record includes a prior conviction for manufacturing methamphetamine and two theft convictions. Weimerskirch testified that in the summer of 2012 he observed Milder at the house on 13th Avenue in a bedroom holding a pop bottle with a hose hanging out of it, which he "related to the process of cooking meth" by using a "smoker bottle." He also testified that he was at Richardson's house one day that summer

when Milder arrived with a bag and asked him to keep watch, presumably for law enforcement, before heading to the detached garage for a couple hours. When Milder returned to the house he had some methamphetamine and shared it with Richardson and Weimerskirch. Weimerskirch further testified that his current fiancée had a white pickup truck registered in her name but which Milder used. On cross-examination, Weimerskirch admitted he was not completely honest with officers during a post-arrest interview and could not remember what he did or did not tell them about Milder. Weimerskirch acknowledged he and Milder had had differences in the past and Milder had assaulted him.

Following the close of the State's case in chief, the court denied Milder's motion for judgment of acquittal, stating it viewed the testimony of the witnesses pursuant to plea agreements as accomplice testimony rather than as coconspirators or codefendants. The court found

> that in viewing the evidence in the light most favorable to the State at this time, there is sufficient evidence to generate a jury question as to whether or not the defendant, based on the evidence, would be found guilty of the offense charged and there is sufficient corroboration of the accomplice testimony in regard to the items seized from the residences of the defendant to avoid a verdict of acquittal.

During a discussion of the proposed jury instructions, neither defense counsel nor the State requested an instruction enumerating the elements of conspiracy to manufacture methamphetamine. The jury was instructed, in part:

INSTRUCTION NO. 17
An "accomplice" is a person who knowingly and voluntarily cooperates or aids in the commission of a crime.
A person cannot be convicted only by the testimony of an accomplice. The testimony of an accomplice must be corroborated by other evidence tending to connect the defendant with the crime.

You are instructed that the Court has found that Curtis Marquette, Amber Wieseler, and Carrie Loper were accomplices and you must consider them accomplices.

The defendant cannot be convicted only by accomplice testimony. There must be other evidence tending to connect the defendant with the commission of the crime. Such other evidence, if any, is not enough if it just shows a crime was committed. It must be evidence tending to single out the defendant as one of the persons who committed it.

INSTRUCTION NO. 19

The State must prove all of the following elements of Manufacture and/or Conspiracy to Manufacture a Controlled Substance, namely Methamphetamine:

1. On or between June 1, 2012, and July 1, 2013, the defendant knowingly manufactured or conspired to manufacture methamphetamine.

2. The defendant knew that the substance he manufactured or conspired to manufacture was methamphetamine.

If the State has proved both of these elements, the defendant is guilty of Manufacture and/or Conspiracy to Manufacture a Controlled Substance, namely Methamphetamine. If the State has failed to prove either of the elements, the defendant is not guilty of Manufacture and/or Conspiracy to Manufacture a Controlled Substance, namely Methamphetamine, and you will then consider the charge of Possession of a Controlled Substance explained in Instruction No. 20.

INSTRUCTION NO. 20

The State must prove both of the following elements of Possession of a Controlled Substance:

1. On or between June 1, 2012, and July 1, 2013, the defendant knowingly or intentionally possessed methamphetamine.

2. The defendant knew that the substance he possessed was methamphetamine.

If the State has proved both of these elements, the defendant is guilty of Possession of a Controlled Substance. If the State has failed to prove either of the elements, the defendant is not guilty.

INSTRUCTION NO. 21

As used in these instructions, for the defendant to know or have knowledge means the defendant had a conscious awareness that he was manufacturing methamphetamine or possessed methamphetamine.

INSTRUCTION NO. 25

Merely because two or more persons associate with each other, or meet to discuss common interests or goals does not, by itself, establish an agreement or make one a member of a conspiracy.

INSTRUCTION NO. 26

An "overt act" is any act indicating a person's intent to accomplish manufacture of methamphetamine. The overt act itself does not have to be a criminal act. An overt act alone does not prove a conspiracy. A person who commits an overt act cannot be found guilty of Conspiracy unless that person also agreed and intended the manufacture of methamphetamine would be committed.

INSTRUCTION NO. 27

The State does not have to prove the defendant knew all the details of the conspiracy nor all the other persons who had agreed to commit manufacture of methamphetamine. However, the State must prove the defendant knowingly participated in the agreement at some time. If a person performs an act that promotes or facilitates the purpose of the conspiracy without knowledge of the conspiracy, he is not a conspirator.

INSTRUCTION NO. 28

Whether a person is a conspirator depends upon his own conduct or statements. If, however, you find the defendant agreed the manufacture of methamphetamine would be committed, then the conduct or statements of the others who agreed to commit manufacture of methamphetamine may be considered as evidence against him, providing the conduct or those statements promoted or facilitated the purpose of the conspiracy and occurred before the conspiracy ended. It is not necessary the conduct or statement of the others occurred in the defendant's presence.

INSTRUCTION NO. 29

A conspiracy requires an agreement between at least two persons. A person may be found guilty of Conspiracy even though the persons with whom he agreed have not been charged or tried.

In closing arguments, the State argued, "I have to prove that the defendant manufactured methamphetamine or he conspired to manufacture methamphetamine beyond a reasonable doubt." The prosecutor referred to "codefendants" during closing arguments and named "Curtis," "Amber," "Scott,"

Everett Clark, and Carrie Loper, then stated, "The defendant is the common denominator. . . . They were all brought together because of their common interest in using meth, their addiction to meth, and their relationship with the defendant."

Defense counsel argued:

> The law is also pretty clear when it comes to these conspiracy cases. The law is clear that mere association is not enough. The State must prove more than just the fact that some people have come together to do—come together to charge somebody with a crime. Now, here is Instruction 17, which the Court will give you. This is the accomplice jury instruction. The law is clear that nobody can be convicted solely on the testimony of an accomplice, that there must be more evidence connecting somebody to a crime.
> . . . .
> . . . The common denominator isn't enough. They need to show you more than just John knew these folks. They got to show you more than just, these folks, who obviously worked together, are working together again to try to get themselves out of trouble.

After the jury had deliberated for some time, they sent a note, "Can we have the definition of conspiracy?" Over Milder counsel's objection that "they've already been instructed on conspiracy in Instruction No. 29" and that "given the State did not charge a separate count for conspiracy, this definition is far too broad for what they've already been instructed as to, and we believe it would be more prejudicial than any value it has," the court provided this supplemental instruction:

INSTRUCTION NO. 24A
The State must prove the defendant and Curtis Marquette, Amber Wieseler and/or Carrie Loper came to a mutual understanding the manufacture of methamphetamine would be attempted or committed. The agreement can be oral or written, informal or formal, and need not be detailed. It may be proven by direct or circumstantial evidence of a person's words, actions or gestures.

The jury returned a verdict finding Milder guilty of "Manufacture and/or Conspiracy to Manufacture a Controlled Substance, namely Methamphetamine."

Milder appeals, contending his trial counsel was ineffective in failing to object to the jury instructions, which stated the charges in the disjunctive and did not instruct on the essential elements of the conspiracy alternative. He also contends he was prejudiced by the trial court's supplemental jury instruction.

**II. Scope and Standards of Review.**

Because they are grounded in the Sixth Amendment to the United States Constitution, we review ineffective-assistance-of-counsel claims de novo. *State v. Thorndike*, 860 N.W.2d 316, 319 (Iowa 2015).

We review the court's decision whether to give further instruction to the jury for an abuse of discretion. *State v. Watkins*, 463 N.W.2d 15, 18 (Iowa 1990).

**III. Discussion.**

*Ineffective-assistance-of-counsel claim.* To succeed on an ineffectiveness claim, Milder must show his trial counsel failed to perform an essential duty and this failure resulted in prejudice. *See Strickland v. Washington*, 466 U.S. 668, (1984); *State v. Corsi*, 686 N.W.2d 215, 221 (Iowa 2004); *State v. Graves*, 668 N.W.2d 860, 869 (Iowa 2003). "Although ineffective-assistance-of-counsel claims should generally be preserved for a postconviction relief action where a more complete factual record can be developed, such claims will be resolved on direct appeal where it appears the outcome will not be altered by taking additional evidence." *Corsi*, 686 N.W.2d at 221.

Iowa Code section 124.401(1) makes it a crime "for any person to manufacture, deliver, or possess with the intent to manufacture or deliver, a controlled substance . . . or conspire with one or more other persons to manufacture, deliver, or possess with the intent to manufacture or deliver a controlled substance." Subparagraph (c)(6) classifies the offense as a "C" felony if the crime involves "five grams or less methamphetamine." Iowa Code § 124.401(1)(c)(6).

"While section 124.401(1) prohibits a variety of conduct, it essentially defines one prohibition that can be violated in a number of ways." *State v. Kern*, 831 N.W.2d 149, 158 (Iowa 2013); *see also State v. Parrish*, 502 N.W.2d 1, 3 (Iowa 1993) (discussing Iowa Code section 204.401(1), the predecessor of Iowa's current controlled substance statute). Our case law establishes that

> a jury need not concur in a single view of the transaction disclosed by the evidence. If substantial evidence is presented to support each alternative method of committing a single crime, and the alternatives are not repugnant to each other, then unanimity of the jury as to the mode of commission of the crime is not required.

*Corsi*, 686 N.W.2d at 222 (citations and internal quotation marks omitted).

Milder was charged with two alternative methods of violating section 124.401(1)(c)—manufacturing methamphetamine and conspiracy to manufacture methamphetamine. Instructional error here concerns the conspiracy-to-manufacture-methamphetamine alternative.

Under the definition of conspiracy set forth in Iowa Code section 706.1, to convict the defendant of conspiracy to manufacture a controlled substance, the State must prove (1) the defendant agreed with one or more persons that one or both of them would manufacture or attempt to manufacture methamphetamine;

(2) the defendant entered into such an agreement with the intent to promote or facilitate the manufacture of methamphetamine; (3) one of the parties to the agreement committed an overt act to accomplish the manufacturing of methamphetamine; and (4) the alleged co-conspirator was not a law enforcement agent or assisting law enforcement when the conspiracy began. *See Kern*, 831 N.W.2d at 158 (citing Iowa Code § 706.1 and *State v. Fintel*, 689 N.W.2d 95, 102 (Iowa 2004)); *see also* Iowa Crim. Jury Instrs. 6001.1–.8.

When reviewing the jury instructions that were actually given by a district court, "we are trying to determine whether the instructions actually given by the district court accurately portray the applicable law to the jury." *State v. Becker*, 818 N.W.2d 135, 144 (Iowa 2012). "A jury instruction that omits an element of a criminal offense is erroneous and not a correct statement of the law." *State v. Hoyman*, ___ N.W.2d ___, ___, 2015 WL 1955663, at *14 (Iowa 2015); *see State v. Pearson*, 804 N.W.2d 260, 265 n.1 (Iowa 2011) (holding the omission of one element of the offense from a jury instruction necessitated a new trial); *State v. Schuler*, 774 N.W.2d 294, 298–99 (Iowa 2009) (finding an instruction that allowed the jury to convict the defendant without finding all elements of the offense was erroneous and ordering a new trial).

The State concedes the instructions given here were erroneous in that they failed to include Iowa Criminal Jury Instructions 600.1 and 600.7.[3] The

---

[3] Instruction 600.1 provides:

> **600.1 Conspiracy - Elements.** The State must prove all the following elements of Conspiracy:
>     1. On or about the ___ day of _____, 19___, the defendant agreed with (name(s) of co-conspirators)

State also concedes trial counsel breached an essential duty in not objecting to the instructions. However, because the claim is raised as one of ineffective assistance of counsel, the State argues the presumption of prejudice is not available to Milder[4] and he cannot prove prejudice because the instructions "addressed concepts relevant to the conspiracy alternative." The State argues "other instructions separately advised the jury on the conspiracy concepts and the State's burden to prove Milder's connections and/or involvement." We disagree.

An ineffectiveness claim was rejected in *Corsi* where defense counsel failed to object to erroneous jury instructions on manufacturing and conspiracy offenses because there was no prejudice to the defendant. *See* 686 N.W.2d at 221-23. There the court noted,

---

> a. that one or more of them would commit the (offense), or solicit another to commit the (offense); or
>> b. attempt to commit the (offense).
> 2. The defendant entered into the agreement with the intent to promote or facilitate (name of felony or aggravated misdemeanor).
> 3. The defendant, or (name(s) of alleged co-conspirator(s)) committed an overt act.
> 4. (Name(s) of alleged co-conspirator(s)) [was] [were] not [a] law enforcement agent(s) investigating the (offense) or assisting law enforcement agents in the investigation when the conspiracy began.
> If the State has proved all of these elements, the defendant is guilty of Conspiracy. If the State has failed to prove any one of the elements, the defendant is not guilty.

Instruction 600.7 provides:

> 600.7 Conspiracy - Separate Offense. Conspiracy is a crime separate from the (offense). The (offense) does not have to be committed. Even if you find (offense) was committed, you cannot find the defendant guilty of Conspiracy unless the State proves the defendant conspired to commit (offense), and an overt act was performed.

[4] *See Thorndike*, 860 N.W.2d at 321-22 (stating a defendant raising an ineffectiveness claim grounded on counsel's failure to object to jury instructions "must affirmatively demonstrate counsel's alleged deficiency undermines our confidence in the verdict and therefore resulted in prejudice entitling him to a new trial, regardless of whether his claim would require reversal if it were before us on direct appeal").

> Although the instruction may have been subject to a valid criticism that it inappropriately classified two alternative ways of violating section 124.401(1) as conspiracy, the error was one of labeling and *not one of substance*. Consequently, there was no prejudice to the defendant that would have required competent counsel to lodge an objection.

*Id.* at 223 (emphasis added). The same cannot be said here.

Even acknowledging that the jurors did not have to agree on the method of violation of section 124.401(1)(c), the instructions did not require the State to prove all the necessary elements of conspiracy, and thus the instructions are fatally flawed. As noted above, to convict the defendant of conspiracy to manufacture methamphetamine, the State was required to prove beyond a reasonable doubt (1) the defendant agreed with one or more persons that one or both of them would manufacture or attempt to manufacture methamphetamine; (2) the defendant entered into such an agreement with the intent to promote or facilitate the manufacture of methamphetamine; (3) one of the parties to the agreement committed an overt act to accomplish the manufacturing of methamphetamine; and (4) the alleged co-conspirator was not a law enforcement agent or assisting law enforcement when the conspiracy began. *See Kern*, 831 N.W.2d at 158.

*(1) The defendant agreed with one or more persons that one or both of them would manufacture or attempt to manufacture methamphetamine.* The State notes that Instruction No. 27 advised "the State must prove the defendant knowingly participated in the agreement at some time." Instruction No. 29 states a conspiracy "requires an agreement between at least two persons." Not until

the court gave the supplemental instruction[5] was the jury informed that the State must prove the "defendant agreed with one or more persons that one or both of them would manufacture or attempt to manufacture methamphetamine."

*(2) The defendant entered into such an agreement with the intent to promote or facilitate the manufacture of methamphetamine.* No instruction given to the jury here requires the State to prove this intent element.

*(3) One of the parties to the agreement committed an overt act to accomplish the manufacturing of methamphetamine.* While Instruction No. 26 includes the "concept" of an overt act, the instructions given do not require the State to prove "one of the parties to the [conspiracy] agreement committed an overt act to accomplish the manufacturing of methamphetamine" as required. *See id.*

We also note that in closing arguments neither the State nor the defense addressed either the element of intent or the commission of an overt act in furtherance of a conspiracy.

*(4) The alleged co-conspirator was not a law enforcement agent or assisting law enforcement when the conspiracy began.* This element is completely lacking in the instructions given, though we acknowledge this element was not at issue at trial.

After being given the instructions, which lacked the elements of conspiracy to manufacture, the jury deliberated for five hours and then sought an additional instruction on the definition of conspiracy. This is indicative the instructions

---

[5] "The State must prove the defendant and Curtis Marquette, Amber Wieseler and/or Carrie Loper came to a mutual understanding the manufacture of methamphetamine would be attempted or committed."

caused confusion because notwithstanding all the instructions the State now relies upon to support the verdict, the jury did not understand the very definition of conspiracy. *See State v. Hanes*, 790 N.W.2d 545, 551 (Iowa 2010) (stating "[o]ur analysis of prejudice is also influenced by an evaluation of whether a jury instruction could reasonably have misled or misdirected the jury" and citing *Anderson v. Webster City Cmty. Sch. Dist.*, 620 N.W.2d 263, 268 (Iowa 2000), which held in a civil case the trial court commits prejudicial error when an instruction "materially misstates the law, confuses or misleads the jury, or is unduly emphasized").

In a case in which trial counsel fails to object to an erroneous instruction, certain factors may militate against a finding of prejudice. *State v. Miles*, 344 N.W.2d 231, 235 (Iowa 1984). First, prejudice may not exist if a separate instruction correctly informs the jury of the element omitted from the marshalling instruction. *Id.* In this case there exist no separate instructions correctly stating that the State was required to prove the intent to promote or facilitate the manufacture of methamphetamine and that one of the parties to the agreement committed an overt act to accomplish the manufacturing of methamphetamine. Second, prejudice may not exist if the element in question is not a fighting issue in the case. *Id.* That is not the case here as Milder denied both alternatives charged. Third, prejudice may not exist where the evidence of guilt is so strong there is no reasonable probability the result would have been different if the instruction in question had been correctly stated. *State v. Hopkins*, 576 N.W.2d 374, 380 (Iowa 1998). Here, we find the length of the deliberation time, while not exceedingly long, contradicts the State's contention that there was overwhelming

evidence that Milder manufactured methamphetamine. After five hours of deliberation, the jury sought a definition of conspiracy. And, after receiving the supplemental instruction, the jury deliberated just another hour and twenty minutes before returning a guilty verdict. Unfortunately, the verdict was premised upon instructions that failed to identify the State's obligation to prove the proper elements of conspiracy.

In light of the State's concession of trial counsel's breach of duty in failing to object to the faulty jury instructions, and the omission of multiple elements of the alternative the jury was deliberating, we conclude Milder has established the necessary prejudice for his ineffectiveness claim. No reasonable or legitimate strategy supports trial counsel's failure to object to the marshalling instruction. *Cf. State v. Williams*, No. 13-1144, 2014 WL 3747691, at *8 (Iowa Ct. App. July 30, 2014) (preserving ineffectiveness claim where trial strategy may explain counsel's failure to request a specific-intent instruction). Although there was ample evidence of manufacturing of methamphetamine, Milder was only one of several suspects, and we cannot conclude with any degree of certainty that the jury would have found Milder guilty beyond a reasonable doubt if it had been properly instructed on the conspiracy theory.[6] *See Schuler*, 774 N.W.2d at 300.

In *Strickland*, which established the two-prong standard to address ineffective-assistance-of-counsel claims, the court stated:

> A number of practical considerations are important for the application of the standards we have outlined. Most important, in adjudicating a claim of actual ineffectiveness of counsel, a court

---

[6] Where there is legal error and it is impossible to determine if the verdict rests upon a valid legal basis, reversal is required. *See State v. Lathrop*, 781 N.W.2d 288, 297 (Iowa 2010); *State v. Heemstra*, 721 N.W.2d 549, 558 (Iowa 2006).

should keep in mind that the principles we have stated do not establish mechanical rules. Although those principles should guide the process of decision, the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.

466 U.S. at 696. Here, we have a fundamentally unfair proceeding, and we are not confident in its result. Because we cannot uphold Milder's conviction on these flawed instructions and trial counsel's failure to object to them, we reverse and remand for new trial.

**REVERSED AND REMANDED.**