# IN THE COURT OF APPEALS OF IOWA

No. 21-1879
Filed July 26, 2023

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**MELINDA LYNN HAINES, a/k/a MELINDA LYNN LATHAM,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Scott County, Meghan K. Corbin, Judge.

A defendant appeals her convictions for second-degree theft, third-degree burglary, and conspiracy to commit a non-forcible felony. **AFFIRMED AND REMANDED.**

Kent A. Simmons, Bettendorf, for appellant.

Brenna Bird, Attorney General, and Bridget A. Chambers, Assistant Attorney General, for appellee.

Heard by Bower, C.J., and Tabor and Greer, JJ.

**TABOR, Judge.**

A jury convicted Melinda Haines[1] of second-degree theft, third-degree burglary, and conspiracy to commit a non-forcible felony—"theft and/or burglary." These convictions stem from a string of storage unit break-ins involving Haines and three accomplices.[2] At trial, the State advanced a theory of aiding and abetting for the theft and burglary charges. On appeal, Haines challenges the sufficiency of the evidence to support her convictions under that theory and contests the proof of the conspiracy. Giving deference to the jury's fact finding, we affirm its verdicts.

But on our review of the record, we find that Haines's convictions for the conspiracy and the underlying offenses must merge. *See* Iowa Code § 706.4 (2022). We remand for the district court to enter a revised judgment order consistent with this opinion.

I.      **Facts and Prior Proceedings**

Cloverleaf Storage sits on the outskirts of Davenport. A fence surrounds the storage units. The only intended entrance is an electronic gate that requires a key card.[3] But someone cut through the chain link fence behind Cloverleaf to fashion another entrance.

In October 2018, Warren Carter called police to Cloverleaf after discovering someone had broken into his unit: "[T]he lock was gone off the door, the clasp was gone, and I opened the door and everything had been rattled through." An officer

---

[1] Before trial, Haines changed her last name to Latham.
[2] The State tried Haines separately from those codefendants.
[3] Cloverleaf did not keep track of when someone used their key card or who entered through the gate.

took inventory of the missing items. But in a self-help measure, Carter decided he'd stay the night in his truck to be sure no one stole anything else from him.

That night, Haines "walked up on [Carter's] truck." Both asked the other what they were doing at Cloverleaf so late. Haines told Carter she lived nearby. She didn't have a key card, so she entered through the hole in the back fence. In turn, Carter told Haines about his stolen property. And, according to Carter, Haines was concerned and "[s]tarted talking about a U-Haul that was supposed to have been there."

It was cold, so Carter offered Haines a seat in his truck. She accepted, and the two drove up to the facility's front gates because Carter believed that the surveillance cameras worked there and he wanted to "make sure everybody [was] on the air." Eventually, someone showed up in "a Forerunner or Blazer" to give Haines a ride. Carter opened the gate for the vehicle and Haines left. According to Carter, "somebody else showed up" that night. "And everybody was talking about this U-Haul."

After that meeting, Carter backed his truck into an empty storage unit. Sure enough, before 2:30 a.m., a U-Haul van arrived at Cloverleaf. He waited for the van to drive by and then pulled his truck out to block it. Carter testified that the U-Haul's two occupants claimed they were there to clean out a specific storage unit. When he told them that they'd driven past that unit, they said he'd scared them because "they thought [he] was a cop."

Carter told them to "go ahead and clean the unit out and get out of there." He then drove around the facility, but noticed the U-Haul "take off." In response, Carter tried to block the gate. But the U-Haul edged through, side-swiping his

truck. Carter "called the law on the phone then" and began following the van on Interstate 280.

As Carter gave chase, an officer from the Buffalo Police Department intervened to stop the van. That officer allowed Carter to look through the U-Haul for any of his stolen property. He identified several items that belonged to him.[4] Carter was not "real sure" how long it had been since his property was stolen.

Police identified the van's occupants as Alton Buford and Sabrina Gilmore. Officers found a Cloverleaf key card in Buford's wallet. The officers notified William Harris, Cloverleaf's owner. Harris checked the facility and verified that at least three other customers' units had been broken into. Police also learned that the stopped U-Haul had been rented by Jake Bakoylis.

Haines knew Bakoylis. Her phone data showed that they called each other twenty-five times on the day of these events and into the next morning. And texts recovered from that phone show their communications that night. In their text conversation, Bakoylis told Haines to take the U-Haul and "anything worth anything." And he urged her to "swear you got me."

The next day, Davenport police found Bakoylis and Buford in a black Chevy Trailblazer that ran out of gas on the side of Interstate 80. When the officers approached the vehicle, they noticed a BB gun and hunting knife. So they asked for consent to search. Bakoylis and Buford said the officers would need to get consent from the vehicle's owner—who turned out to be Haines. An officer called

---

[4] These items included a bungee chair, tools, jewelry, decorative knives, lighters, medication, and a copy of his identification card.

Haines, and she consented.[5]  But at the scene, the men refused.  The officers then brought in a canine unit.  When the dog alerted to the presence of drugs, the officers believed they had probable cause to search the vehicle.  Inside, they found property stolen from storage units.  When contacted by police, Haines verified what property belonged to her.  She did not claim any of the stolen items.

During that conversation, Haines told the officer that she met Bakoylis just a few days earlier.  Yet their text exchanges suggested a greater familiarity.  For instance, before Bakoylis ran out of gas, Haines told him to "[g]o somewhere in the truck" because she "didn't want it" at her home.  Bakoylis also texted her once police sought consent to search and asked her to "bond [him] out if needed."  She agreed to "do everything" she could and asked twice where Buford was.  The two then discussed the property in the vehicle:

> 10/19/2018 | 10:05 p.m. [Bakoylis]: Yeah and I told them all the shit came from your buddy asking you tooveit for him but your BD was showing up so you were gonna wait for us to get back from borrowing money from my lil bro josh
>
> 10/19/2018 | 10:07 p.m. [Haines]: All what shit?  The knifes and bb gun??  Nothing else is on me
>
> 10/19/2018 | 10:08 p.m. [Bakoylis]: Duh it's not reread that none of it was ours and delete these after reading
>
> 10/19/2018 | 10:08 [Haines]: I am

And it was not just Bakoylis who kept in touch which Haines.  Buford also texted Haines from Bakoylis's phone many times over the next few days, asking if she was "okay."

---

[5] While law enforcement and Haines agree she consented, she told Bakoylis by text that she had not agreed to the search.

A few days later, the Scott County Sheriff's Department executed a search warrant at the house where Haines lived with her parents.[6] The house was about five minutes from Cloverleaf. In their search, officers found a reciprocal saw belonging to Carter.

While officers were searching the house, Haines agreed to talk with Detective Eric Roloff in his squad car. During that interview, Haines admitted going to Cloverleaf the night officers stopped the U-Haul. She claimed that she went to retrieve her parents' key card. She said the card found in Buford's wallet "looked exactly like" her parents' card and that Bakoylis told her that Gilmore gave it to him. Haines "originally thought" her sister—Kunce—had given it to them. She also knew Bakoylis had a U-Haul, but asserted she "didn't know shit" about the break-ins. She said the U-Haul was in Bakoylis's name, but Gilmore and Buford were paying to live in it. From her calls with Bakoylis, she believed that they were coming to the storage facility with the U-Haul that night but "they never showed up." Haines reiterated that she'd known Bakoylis "a week, tops."

As for the second incident, Haines acknowledged that she let Bakoylis and Buford borrow her Trailblazer. But she claimed she did so because she did not want her son's father to know she had transportation available because she made up "a bullshit excuse" to get out of dropping her son off at his father's home.

Roloff asked Haines if her sister Kunce was involved with Bakoylis, Buford, and Gilmore. Haines didn't know if she was "hanging out" with them. But later Haines told Roloff that Bakoylis said he got drugs from Kunce. For her part, Haines

---

[6] Her older sister—Wendy Kunce—had been living with them from September until the first half of October.

admitted she was not "by any means criminally perfect" but was concerned about being a "snitch," especially while her sister was "staying here and the people she fucks with." Haines admitted that in the past she herself had done acts similar to the storage unit break-ins, but then asked "why now with me?" And she observed that "it's only started since my fucking sister has been back here."

Haines also let Roloff look through her phone—where he saw photos of property stolen from Cloverleaf.[7] A later examination of the phone's metadata showed the photos had been uploaded in September 2018.

In November 2019, the State charged Haines with second-degree theft, third-degree burglary, and conspiracy to commit a non-forcible felony.[8] The State originally listed Kunce as a witness on its trial information. But at trial, Haines called her instead. Kunce testified that she had been living at her parents' home in the fall of 2018. She told the jury that she knew Gilmore and was acquainted with Bakoylis. And she admitted to giving them her parents' key card to access to the storage facility. Kunce testified that Haines did not know about the storage unit break-ins. According to Kunce, she used Haines's phone to post photos of stolen property on Facebook Marketplace. But Kunce never told Haines that some items were stolen. Kunce asserted that Haines eventually stopped helping her because "she knew something was up, something wasn't right."

---

[7] The images included a stove, a washer/dryer set, a generator and an air compressor.

[8] The State also charged Bakoylis, Buford, and Gilmore.

In closing argument, the State urged the jury not to credit Kunce's testimony exculpating Haines.[9] Instead, the State asked the jurors to find that it had proven Haines's "presence at the crime and knowledge of the crime and association with the co-conspirators." The jury found Haines guilty as charged.

At sentencing, the district court imposed concurrent terms not to exceed five years imprisonment for each offense. The court suspended the sentences, ordering Haines to undergo three years of probation supervision. She appeals.

## II.     Analysis

### A.  Sufficiency of the Evidence

Haines's sole contention on appeal is that the State failed to offer substantial evidence to support her three convictions. We review sufficiency claims for correction of legal error. *State v. Crawford*, 974 N.W.2d 510, 516 (Iowa 2022). We consider whether, when taken in the light most favorable to the State, the verdicts are supported by substantial evidence. *Id.* Evidence is substantial if it would convince a rational trier of fact that Haines is guilty beyond a reasonable doubt. *See id.* This standard means that evidence must do more than raise "suspicion, speculation, or conjecture" to a reasonable jury. *State v. Leckington*, 713 N.W.2d 218, 221 (Iowa 2006).

---

[9] Kunce did not provide this information until her deposition. When asked by the State why it took so long to come forward, Kunce said she had been "getting [herself] better" in substance-abuse treatment. She explained "I knew I couldn't let [Haines] take responsibility for my actions. When you come clean, it kind of hits you. And as much as I hated her, because we don't get along very well, but I needed to make it right."

### 1. Aiding and Abetting

For her burglary and theft convictions, the State relied on a theory of aiding and abetting.[10]  Iowa Code § 703.1.  So the court instructed the jury that Haines was guilty if she knowingly approved and agreed to committing the storage unit break-ins.  This approval and agreement can be show by evidence of Haines participating in the break-ins or "knowingly advising or encouraging" them before or when they occurred.

And since these are specific-intent crimes, she can only be guilty if she participated, advised, or encouraged with the requisite intent or knew that her co-defendants acted with such intent.  *State v. Tangie*, 616 N.W.2d 564, 574 (Iowa 2000).  Proving Haines knew about the break-ins before they happened is "essential" to this theory.  *State v. Neiderbach*, 837 N.W.2d 180, 211 (Iowa 2013).  But showing her knowledge is not enough.  *State v. Henderson*, 908 N.W.2d 868,

---

[10] The court instructed the jury that, to prove theft, the State had to show that:

> 1. On or about the 1st day of September, 2018 to the 31st day of October, 2018, the Defendant, or someone she aided and abetted, took possession or control of another's property.2. The property, at the time of the taking, belonged to or was in the possession of that other person or persons.
> 3. The Defendant, or someone whom she aided and abetted, had the specific intent to permanently deprive the owner(s) of their property.

And to prove burglary, the State had to show:

> 1. On or about the 1st day of September, 2018 to the 31st day of October, 2018, the Defendant, or someone she aided and abetted, entered into another's storage unit.
> 2. The storage unit was an occupied structure . . . .
> 3. The Defendant, or the person she aided and abetted, did not have permission or authority to enter the storage units.
> 4. The storage unit was not open to the public.
> 5. The Defendant, or the person whom she aided and abetted, did so with the specific intent to commit a theft.

876 (Iowa 2018). Nor is showing her presence at the scene of the crime. *Id.* Instead, the State had to prove her active participation or encouragement of the crimes. *State v. Vesey*, 241 N.W.2d 888, 891 (Iowa 1976).

Carter's testimony put Haines at the storage facility the night of an attempted break-in. And a reasonable jury could infer that her mentioning a U-Haul to Carter meant that she knew about the plan to steal from the storage units. But is there more than her presence and knowledge?

Haines says there isn't. She admits the State proved she was at Cloverleaf a "couple" hours before Buford and Gilmore arrived in the U-Haul. But she claims "[t]here is no evidence" showing that she "somehow encouraged or provided advice" on the attempted break-in. She also points out that Kunce admitted being "in on" the scheme and swore that Haines was not involved.

Granted, the direct evidence of her participation and encouragement is scarce. But Haines's guilt may be shown by circumstantial evidence. *State v. Lewis*, 514 N.W.2d 63, 66 (Iowa 1994). Along with presence and knowledge, that evidence can include companionship and conduct, both before and after the offense. *Id.* Still, her conduct is relevant only when it shows she advised, encouraged, or participated in the scheme either before or during the break-ins. *See State v. Hustead*, 538 N.W.2d 867, 870 (Iowa Ct. App. 1995) (citation omitted) ("An accused may not be convicted as a principal on the theory of aiding and abetting for conduct that only supports an accessory after the fact.").

As its central piece of evidence, the State relies on the text messages between Haines and Bakoylis on the night she told Carter that she expected a U-Haul to arrive at Cloverleaf:

10/17/2018 | 10:04 p.m. [Bakoylis]: Hey take that uhaul and everything cause the uhaul is in my name

10/17/2018 | 10:05 p.m. [Haines]: K

10/17/2018 | 10:05 p.m. [Bakoylis]: Swear you got me frfr[11]

10/17/2018 | 10:05 p.m. [Haines]: More than a fat kid has cellulite

10/17/2018 | 10:08 p.m. [Bakoylis]: Twice lhfh[12] anything worth anything take that shit lhhbs

10/17/2018 | 10:11 p.m. [Haines]: Answer your f****** phone

At oral argument, defense counsel conceded that these texts could be interpreted to incriminate Haines.[13]  But counsel also pointed out that these messages could be read to support Haines's story that Gilmore and Buford were living in the U-Haul and Bakoylis wanted her to take it back when she went to retrieve her parents' key card.  We agree that this text exchange—while suspicious—amounts to an ink blot.  *See State v. Barnes*, 204 N.W.2d 827, 829 (Iowa 1972) ("Suspicion is no substitute for proof.").  Still, we must read these messages in the context of all other evidence presented at trial.  *See State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012).

Let's start with Haines's companionship with Bakoylis and Buford.  In her police interview, Haines downplayed her relationship with Bakoylis.  True, her

---

[11] An officer testified at trial that "frfr" means "for real, for real."

[12] That acronym may mean "Laugh Hella Fucking Hard."  LHFH, Urban Dictionary, https://www.urbandictionary.com/define.php?term=LHFH (last accessed June 6, 2023).

[13] In closing argument, the prosecutor took that interpretation too far, telling the jury: "[Haines] was there talking about the U-Haul truck. There were text messages on her phone saying take the truck and go steal stuff."  Haines objected to this statement as "grossly" mischaracterizing the facts.  The district court sustained the objection.

phone data showed their texting started the day before her encounter with Carter at Cloverleaf. But Haines cannot deny the intensity of their communication moving forward. She and Bakoylis called each other over twenty times before he texted that she should take "anything worth anything."

On top of that, Haines hosted Bakoylis and Buford at her home the next day, allowing them to borrow her truck. Both Buford and Bakoylis continued to text Haines after law enforcement found them with stolen property—asking if she was okay and discussing the police investigation. This degree of camaraderie reveals more than a cursory relationship among those three accomplices around the time of the break-ins. A jury could find that this evidence, alongside the text exchange, pointed to Haines's involvement in the break-ins and contradicted her police interview. *See State v. Cox*, 500 N.W.2d 23, 25 (Iowa 1993) ("A false story told by a defendant to explain or deny a material fact . . . is by itself an indication of guilt . . . [and shows that] the defendant fabricated evidence.").

And the State lists more incriminating conduct. Haines had photographs of stolen property on her phone dating to September 2018. Her parents' key card ended up in Buford's wallet. Police recovered stolen property from her vehicle after she loaned it to Buford and Bakoylis. And police found stolen property in her residence a few days later. *Cf. State v. Miles*, 346 N.W.2d 517, 520 (Iowa 1984) (finding defendant aided and abetted in a theft in part because her companion put stolen property in defendant's purse).

Our standard of review requires us to interpret all reasonable inferences in favor of the State. *Crawford*, 974 N.W.2d, 516. Under that standard, the confluence of circumstantial evidence ensures us that a rational jury could find

Haines guilty of aiding and abetting. True, she did not confess. And Kunce testified that Haines was not involved in the break-ins. But the jury was free to discount their stories.[14] *State v. Nitcher*, 720 N.W.2d 547, 556 (Iowa 2006). Based on Haines's text exchange with Bakoylis—along with the volume of contacts with her accomplices, her lack of candor, and her conduct before and after seeing Carter at Cloverleaf on the night of another attempted break-in—a rational jury could conclude that she participated in the burglary and theft scheme.

## 2. Conspiracy

We next turn to Haines's conspiracy conviction. Under the marshalling instruction, jurors could convict Haines if—first—they found that she agreed that at least one of the co-defendants would commit a theft or burglary, attempt to do so, or solicit someone else to do so. Second, she made that agreement with the specific intent to promote or facilitate those crimes. And finally that one of them committed an overt act in furtherance of that conspiracy.

Haines claims that the State did not prove the first element. She insists that there was not substantial evidence of an agreement between her, Bakoylis, Buford, or Gilmore to carry out the storage unit break-ins.

A conspiracy is a "criminal contract" where at least two people have a meeting of the minds to carry out illegal activity. *See State v. Kern*, 831 N.W.2d 149, 159 (Iowa 2013). This agreement does not require a written statement or even a verbal expression. *State v. Larue*, 478 N.W.2d 880, 882 (Iowa Ct. App.

---

[14] Indeed, Haines's dishonesty was on display in her text messages with Bakoylis during the search of her Trailblazer. She gave officers consent to search but told Bakoylis she hadn't.

1991). And it can be inferred from circumstantial evidence. *State v. Kern*, 831 N.W.2d 149, 159 (Iowa 2013). But such evidence must amount to more than mere presence or general association with potential co-conspirators. *Id.* It must amount to a "tacit understanding" between them. *State v. Speicher*, 625 N.W.2d 738, 742 (Iowa 2001).

Haines contends the State's case was doomed for its lack of specifics: "The State never offered evidence of any particular or approximate date" when Haines communicated with Bulford or Gilmore or what they talked about. And as for her interactions with Bakoylis, Haines notes that she told Detective Roloff that she had known him for a week at most.

But as with the aiding and abetting challenge, Haines's own texts undermine her claim. When Bakoylis told her to take the U-Haul and "everything," she responded "K." And when he asked her to affirm that she had his back, she did so. The exchange concluded with Bakoylis telling her to take "anything worth anything." While these messages lack context, we evaluate them along with circumstantial evidence described above. Haines's conduct before and after her text exchange with Bakoylis betrayed knowledge of and participation in the storage unit break-ins. Haines hung out with Buford and Bakoylis after the attempted break-in and communicated with them about the case. Still, when questioned by law enforcement, she minimized their relationship. *See State v. Arthur*, 135 Iowa 48, 109 N.W. 1083, 1084–85 (1906) (noting that "[u]tter strangers are not likely to conspire to commit crime" and finding a defendant's dishonest "denial of acquaintance is very significant" in reviewing evidence of conspiracy). Evaluating the text messages together with this circumstantial evidence, a rational jury could

find she formed a tacit understanding with at least one of her co-conspirators to commit the burglaries and thefts.

To sum up, we don't think the evidence of Haines's guilt is overwhelming. But that's not the standard. *State v. Vinsick*, No. 17-1344, 2018 WL 3472043, at *5 (Iowa Ct. App. July 18, 2018). And we aren't the factfinder. Viewing the evidence in the light most favorable to the State, substantial evidence supports the jury's verdict. *See Leckington*, 713 N.W.2d, 213.

## B.  Sentencing

Before closing, we address a problem not briefed by the parties.[15]  The jury found Haines guilty of second-degree theft, third-degree burglary, and conspiracy to "commit Theft in the Second Degree and/or Burglary in the Third Degree."  Then the district court entered judgments and sentences on all three verdicts.  Trouble is, "[a] person may not be convicted and sentenced for both the conspiracy and for the public offense."  Iowa Code § 706.4.  When a jury returns verdicts on both conspiracy and the offense underlying the conspiracy, that statute "requires merger and mandates sentencing solely on the substantive offense."  *State v. Waterbury*, 307 N.W.2d 45, 52 (Iowa 1981).  Under that statute, the court should have imposed judgment and sentenced Haines only on the theft and burglary offenses.  So we remand for the district court to enter a revised judgment order.

**AFFIRMED AND REMANDED.**

---

[15] Even without briefing, we may exercise our discretion to correct this illegality. *State v. Wieneke*, No. 20-0125, 2021 WL 219222, at *1 (Iowa Jan. 22, 2021) (noting an illegal sentence can be corrected at any time, normal rules of error preservation do not apply, and the appellate court may correct an illegal sentence when it comes to the court's attention).